**Travis Marcellaus EDWARDS, Appellant**

**v.**

**The STATE of Texas, Appellee**

**NO. 01-15-00416-CR, NO. 01-15-00417-CR, NO. 01-15-00418-CR**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued June 16, 2016

Discretionary Review Refused October 19, 2016

Daucie Schindler, Assistant Public Defender, Houston, TX, for Appellant.

Devon Anderson, District Attorney— Harris County, Jessica A. Caird, Assistant District Attorney, Houston, TX, for State.

Panel consists of Justices Jennings, Massengale, and Huddle.

## OPINION

Terry Jennings, Justice

A jury found appellant, Travis Marcellaus Edwards, guilty of the offenses of aggravated assault of a security officer,[1] aggravated robbery,[2] and unlawful possession of a firearm by a felon.[3] After finding true the allegation in an enhancement paragraph in each indictment that appellant had been previously convicted of a felony offense, the trial court assessed his punishment at confinement for thirty years for the offense of aggravated assault of a security officer, thirty years for the offense of aggravated robbery, and ten years for the offense of unlawful possession of a firearm by a felon. The trial court ordered that the sentences run concurrently, and it entered an affirmative finding that appellant used a deadly weapon in the commission of the offenses of aggravated assault of a security officer and aggravated robbery. In four issues, appellant contends that the evidence is legally and factually insufficient to support his conviction for the offense of aggravated robbery and the trial court erred in denying his motion to suppress evidence and admitting certain evidence.

We modify the trial court's judgments and affirm as modified.

## Background

Angel Madrazo, the complainant, testified that on June 21, 2012, while he was working as a security officer at a "game room," a "shooting incident occurr[ed]." As a "certified security officer," he carried a 9–millimeter gun and a badge with the words "security officer" "[o]n [its] front." At the game room, his duties included "working at the door," "check[ing]" that no one entered the game room "with any type of weapon," and "watch[ing] over the customers." Typically, Madrazo, armed with his gun, would sit in a chair near the front door in the lobby portion of the game room.[4] · In order to "enter" the game room, a person was required to be a "member," and Madrazo knew "[a]ll" of the members of the game room.

During his shift on June 21, Madrazo, standing in the lobby of the game room, saw a "white Dodge Stratus," with four men inside, parked directly in front of the game room in an "[ab]normal" place in the parking lot. Appellant and another man,

---

1. See Tex. Penal Code Ann. § 22.02(a)(2), (b)(2)(D) (Vernon 2011); appellate cause no. 01–15–00416–CR; trial court cause no. 1353154.

2. See Tex. Penal Code Ann. § 29.03(a)(2) (Vernon 2011); appellate cause no. 01–15–00417–CR; trial court cause no. 1443321.

3. See Tex. Penal Code Ann. § 46.04(a) (Vernon 2011); appellate cause no. 01–15–00418–CR; trial court cause no. 1443322.

4. Madrazo explained that the lobby was a "tight space," approximately "3 × 3" feet or "4 × 4" feet.

neither of whom Madrazo had ever seen before, "got out" of the car and approached the game room. Madrazo asked the men "[i]f they were members and if they had been [t]here before," to which they responded "[y]es." However, Madrazo felt that "something was wrong" and became suspicious.

Madrazo asked the two men to "produce [their] memberships," but neither complied. Appellant then "pulled out a gun," "came right in front" of Madrazo, and "practically put the gun to [his] face." Because Madrazo did not have time to "pull out" his gun, he kicked appellant, who then fired his gun at Madrazo. Appellant and the other man "took off running."

Madrazo, with his gun "in . . . hand," followed the two men out of the game room. Appellant and the other man ran in opposite directions, while the two men who had remained in the Dodge Stratus, exited the car, got behind it, and "fired . . . shots" at Madrazo. When appellant reached a nearby "wall" and was "safe," he also "started shooting," "rapidly" and "venomous[ly]," at Madrazo. All four men "fired simultaneously" at Madrazo "from different angles," and Madrazo responded by firing his gun about "15 to 16" times. When appellant and the three other men "felt that the police were close by," they "took off running."

After the shooting, a Harris County Sheriff's Office ("HCSO") deputy showed Madrazo a photographic array of six men, and Madrazo identified appellant as the man who came into the game room and confronted him with a gun. It was not "hard" for Madrazo "to pick [appellant] out." He was "[a] hundred percent" certain that appellant was the man who had "pulled the gun on [him]," and he could not "forget" appellant. Madrazo explained that he was "afraid for [his] life" when appellant "pulled" out the gun, and based

on his experience "working at game rooms," he opined that appellant had come to the game room to commit a robbery. Madrazo, however, did note that neither appellant nor the man who had entered the game room with appellant verbally "demand[ed][any] money" from Madrazo.

Maria Medina testified that on June 21, 2012, while she was working at the game room doing "housekeeping" and "pass[ing] out . . . snacks[ ][and] food," two men "walked in" and "wanted to take [Madrazo's] gun away from him." When the two men tried to take Madrazo's gun, "one of the two men" shot his gun. After the shot was fired, Madrazo and the two men left the game room, with the two men running "to the right." Medina noted that only a single gunshot was fired inside the lobby of the game room, and she had previously "see[n] a large amount of cash" in the game room's office.

Katherine Butler testified that she was a member of the game room and was present when the shooting occurred. While Madrazo was standing inside the lobby, she was inside the game room "on the third machine." When a "guy" outside of the game room tried to enter by pushing the front door open, Madrazo told him that he could not. The "guy" then shot a gun. After the gun "went off," Madrazo "grabbed his gun and went out the door." There was "shooting everywhere," with "bullets . . . coming from everywhere." Butler explained that "several shots" were shot at Madrazo, who was trying to "protect" the people inside of the game room, and she noted that the game room contained "[s]lot machines," into which a person would "put money" and "could win up to $600 or $700 . . . or $1,000."

Curtis Young testified that he had "gamble[d]" at the game room "[m]any times" and had won "a little bit more" than $2,000 there. He noted that the game room,

which had an "ATM" machine, had "about a hundred and something games" and members "gamble[d]" with cash, namely "[h]undreds, fifties, twenties, [and] tens." According to Young, it was "possible ... to win a substantial amount of money," as much as $20,000, at the game room. And he had been "concern[ed]" about "getting robbed" at the game room because "it happen[ed] a lot."

On the day of the shooting, as Young "approached" the game room, he saw a Dodge Stratus abnormally parked in front. He then saw the security officer and another "guy" "tussling." When the security officer "kicked" at the other "guy," the "guy" pulled out his gun and "started shooting" at the security officer, who subsequently "started shooting back." Several other "guys" then exited the Dodge Stratus, and "at least three" of the men "[f]ire[d] their weapon[s]" in the security officer's direction. The "guy," with whom the security officer had the "confrontation," was one of the men "shooting." Young noted that during the incident, he did not hear anyone say, "[g]ive me the money," "[p]ut your hands up," or "[e]mpty your pockets." And none of the men "tr[ied] to get any money from anyone in the parking lot."

During Young's testimony, the trial court admitted into evidence a tape recording of the telephone call that Young made for emergency assistance. During the call, Young stated that there was a "shootout," with "five guys shooting" near a "white Dodge" in the parking lot. Young described the "guys" as "young, black males" in their "20s." And he noted that the security officer was "shooting back" and the "guys" "ran off" towards some apartments.

Ashley Alexander testified that she owned the Dodge Stratus that had been parked in front of the game room on the day of the shooting. The last time that she had seen her car was in June 2012 before it was "stolen." Alexander explained that she did not drive the car to the game room location and was not at the game room on the day of the shooting. She further noted that she did not know appellant, did not lend her car to anyone, and was sleeping at the time her car was stolen.

HCSO Deputy R. Rincon testified that he was assigned to investigate the game room shooting. During the incident, several "suspects were seen" near a car that was "found" "within feet of the game room in the parking lot," and these "suspects" "took cover behind the vehicle when the shootout occurred."[5] The crime scene unit investigator, HCSO Deputy G. Clayton, "lifted" a handprint from the car, which had been "left at the scene," and "it came back" with a match to appellant. Subsequently, Rincon complied a photographic array of six men and showed it to Madrazo, who "immediate[ly]" identified appellant "as the person who approached him at the game room on June 21, 2012." In regard to appellant, Madrazo stated, "Yes, that's the one that shot at me.... He's the first one who shot at me."

Deputy Rincon further explained that the game room actually had "two doors" because it had a "greeting room." The "greeting room" was "inside the game room," but it was not actually "where the [gaming] machines" were located. According to Rincon, it was in the "greeting room" where appellant fired the initial shot. And he noted that no verbal "demand[ ]" for money had been made during the incident.

5. Deputy Rincon further noted that Madrazo had reported that "some suspects" had been "hiding behind" the car when "they were shooting at him."

Deputy Clayton testified that on June 21, 2012, he was dispatched to investigate the crime scene at the game room after the shooting. He recovered a "number of spent shell casings" from the game room's parking lot and a "9–millimeter semi-automatic weapon," which belonged to "the security guard at the scene." Clayton explained that he found "numerous shell casings" "going down the right hallway from the game room." Based on the number of "shell casings" recovered at the scene, Clayton opined that "at least two guns" had been used during the shooting.

Deputy Clayton further testified that he examined the Dodge Stratus that was parked in front of the game room. He noted that its "ignition system had been broken" or "tampered with," which indicated that the car had been stolen. Clayton also recovered, from "the rear deck, the rear trunk lid" of the car, a handprint. When he "processed" the handprint through an "automatic fingerprint system," he received a "hit," or a "possible identification," for appellant. Clayton then performed a "manual comparison," which showed that "th[e] [hand]print on the vehicle matched" appellant's known handprint. On the day before trial, Clayton made another comparison of appellant's handprint with the one found on the car, and "the print that was taken off the vehicle was, again, identified for [appellant]." Clayton opined that the handprint found on the car parked directly in front of the game room was "left by" appellant. Clayton also noted that he had recovered a cellular telephone that had been "left on top of the vehicle," and the trial court admitted it into evidence.

Tuan Pham, an investigator with the Harris County District Attorney's Office, testified that he is a member of the "digital forensic investigations unit" and "handle[s] ... any kind of digital media that needs to be downloaded and preserved and put into an evidentiary format." He explained that he "did [an] extraction" of the cellular telephone recovered by Deputy Clayton from the top of the Dodge Stratus on the day of the shooting. Pham "download[ed] ... information off of" the cellular telephone, "extract[ing] the data," including photographs, text messages, and the call log.

During Pham's testimony, the trial court admitted into evidence eight photographs, State's Exhibits 209–16, that he had extracted from the cellular telephone. Pham, while describing certain photographs as "selfies,"[6] identified appellant as the only person pictured in the photographs. He noted that the cellular telephone did not contain "selfie photographs" of any other individuals and the "vast majority of the photographs" on the cellular telephone were of appellant, including him "nude." Pham explained that in State's Exhibit 209, appellant can be seen holding the cellular telephone that Deputy Clayton recovered from the top of the Dodge Stratus on the day of the shooting.

Pham further explained that he knew that the photographs, State's Exhibits 209–16, "were actually taken with" the cellular telephone itself because the "metadata"[7] for each particular photograph showed its origin. And the metadata for the "numerous nude pictures" of appellant on the cellular telephone showed that they had been taken with that telephone. Pham did note, however, that the cellular

6. A "selfie" is "a photograph that a person takes of himself ... with a cell phone for posting on social media." *Selfie,* WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed.2014).

7. "Metadata" is "a set of data that describes and gives information about other data." *Metadata,* NEW OXFORD AMERICAN DICTIONARY (3d ed.2010).

telephone contained photographs of individuals other than appellant, including "pictures of other males."

Pham further testified that the "only e-mail" account "uploaded" on the cellular telephone was "Travis.edwards83@gmail.com" and e-mails had been received on the phone via that e-mail address from June 10, 2012 until June 22, 2012. Pham also retrieved the cellular telephone's "chat log" from "Facebook messenger,"[8] which showed messages from "Travis Edwards" to other Facebook users from March 28, 2012 until June 5, 2012.

In regard to the text messages extracted from the cellular telephone, Pham noted that on April 5, 2012, in response to a text message asking, "What is your last name," "Edwards" was replied from the cellular telephone.[9] Further, on June 21, 2012, the day of the shooting, the following text messages were sent from and received by the cellular telephone:

> Received: "A lil mexican man for security. One man, two chicks mexicans. They by the door the mexican chick in purple got the money."
>
> Sent: "So its four people total. One security guard two floor workers both ladies and a dude? What cide do he have his strap[[10]] on? Also is he opening tha doors to let people out"?
>
> Received: "Right side but he old."

> Sent: "How many people total on tha floor n where is the employee only door at? also is he opening tha door to let people out?
>
> Received: "He swing the door open wide."
>
> Sent: "How many people total on tha floor 3 or 4? Whenever its good we ready."
>
> Received: "Yea he open it and he watching tv with two of the workers talking the one with money in the purple got the money."
>
> Sent: "So its just two ladies n a security guard? i keep asking bcuz dont wont no surprises."
>
> Received: "One other Mexican man in a gray shirt."
>
> Sent: "Do he have a strap"?
>
> Received: "Yea on the right side."
>
> Sent: "We were finding a escape route. Is it still good?"
>
> Received: "Yea."
>
> Received: "They empting two machine."
>
> Sent: "Let them empty them all out. Keep ur eyes open they bout to hit tha bacc room n count tha scrill."[11]
>
> Received: "Ok."
>
> Sent: "Where is the employees only room located"?
>
> Received: "In the front."
>
> Sent: "To the left r right? Queen i need specific details."

8. "Facebook Messenger is a mobile tool that allows users to instantly send chat messages to friends on Facebook. Messages are received on [users'] mobile phones." *Facebook Messenger*, TECHOPEDIA, https://www.techopedia.com/definition/28490/facebook-messenger (last visited May 5, 2016); *see generally* FACEBOOK, https://www.facebook.com (last visited May 5, 2016).

9. Other text messages received to the cellular telephone stated: "Hw r u doin today mr Travis?"; "Ok Mr. Edwards"; "I got ur child.

The lady at the daycare say was actin up and sayin bad words Mr. Edwards"; "She say she miss u. I told her u came by today Mr. Edwards"; "I'm serious Mr. Edwards"; and "Will u b attending her first say of skool ths yr? Mr. Edwards."

10. Pham testified that "strap" is a slang term for a "[f]irearm."

11. Pham testified that "scrill" is a slang term for "[m]oney."

Received: "Nall the back but let me watch them cause they signs fucked up thats a restroom right in front but its two doors in the back."

Sent: "To the left r right? Queen I need specific details."

Received: "They all doing the machines with the money in a honey bun box."

Sent: "Let them finish n when they all on tha floor text me when its good."

Received: "Ok."

Received: "Money room back right hand side on the ATM Side."

Sent: "When its cool let us know."

Received: "Ok one chick in the back but they close at 12."

Sent: "Is u ready n can that door b kicced open. Is the money room open"?

Received: "The chick in black in ther and the chain off the door what I need to do"?

Sent: "If its cool n tha security guard chilling draw ur tic n hit me."

Received: "Im da only person left whats good"

Sent: "When u c us pull up cum out. When he get out."

Received: "Come on."

### Sufficiency of Evidence

In his third issue, appellant argues that the evidence is legally insufficient to support his conviction for the offense of aggravated robbery because "[n]o witness testified that he attempted to obtain control over their property." In his fourth issue, appellant argues that the evidence is factually insufficient to support his conviction for the offense of aggravated robbery because "[v]iewing all of the evidence in a neutral light, no rational jury could [have]

f[ound] beyond a reasonable doubt that [he] had the intent to obtain and maintain control of [Madrazo's] property." He also asserts in his fourth issue that if the Court "fails to conduct a factual sufficiency review," as required by the Texas Constitution,[12] he "will be denied due process of law."[13]

■■■ We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.* This Court now reviews the factual sufficiency of the evidence under the same appellate standard of review as that for legal sufficiency. *Ervin v. State*, 331 S.W.3d 49, 52–56 (Tex.App.–Houston [1st Dist.] 2010, pet. ref'd). And this Court has previously rejected constitutional challenges, such as those made by appellant, to the use of the *Jackson*—sufficiency standard when conducting a factual-sufficiency

---

12. Tex. Const. art. V, § 6(a).

13. U.S. Const. amends. V, XIV; Tex. Const. art. I, § 19.

review. *See, e.g., Kiffe v. State,* 361 S.W.3d 104, 109–10 (Tex.App.–Houston [1st Dist.] 2011, pet. ref'd); *see also Tan v. State,* No. 01–15–00511–CR, 2016 WL 1267813, at *3 (Tex.App.–Houston [1st Dist.] Mar. 31, 2016, no pet.) (mem. op., not designated for publication).

A person commits the offense of robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." Tex. Penal Code Ann. § 29.02(a)(2) (Vernon 2011). A person commits the offense of aggravated robbery if he commits robbery and "uses or exhibits a deadly weapon." *Id.* § 29.03(a)(2) (Vernon 2011). A firearm is considered a deadly weapon. *Id.* § 1.07(a)(17)(A) (Vernon Supp.2015). " 'In the course of committing theft' means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." *Id.* § 29.01(1) (Vernon 2011). Theft is the unlawful appropriation of property with intent to deprive the owner of the property. *Id.* § 31.03(a) (Vernon Supp.2015).

■■■ "Intent is almost always proven by circumstantial evidence." *Trevino v. State,* 228 S.W.3d 729, 736 (Tex.App.–Corpus Christi 2006, pet. ref'd); *see also Hart v. State,* 89 S.W.3d 61, 64 (Tex.Crim.App. 2002) ("Direct evidence of the requisite intent is not required . . . ."). "A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the victims." *Manrique v. State,* 994 S.W.2d 640, 649 (Tex.Crim.App.1999); *see also Razor v. State,* No. 03–13–00568–CR, 2015 WL 3857293, at *2 (Tex.App.–Austin June 17, 2015, no pet.) (mem. op., not designated for publication) ("The jury may infer the requisite intent to obtain control of a victim's property from the conduct of the defendant."). Proof of a completed theft is not required to establish the commission of a robbery. *Wolfe v. State,* 917 S.W.2d 270, 275 (Tex.Crim.App.1996).

■■■ Here, Madrazo testified that while working as a security officer at a game room, he saw a "white Dodge Stratus," with four men inside, parked directly in front of the game room in an "[ab]normal" place in the parking lot. When appellant and another man approached the game room, Madrazo asked them whether "they were members and if they had been [to the game room] before." Although the men responded "[y]es," they did not "produce [their] memberships" upon Madrazo's request, and he became suspicious and felt that "something was wrong." Appellant then "pulled out a gun," "came right in front" of Madrazo, and "practically put the gun to [his] face." Madrazo kicked appellant, who then fired his gun and "took off running."

Madrazo followed appellant and the other man, who ran in the opposite direction from appellant. The two men who had remained in the Dodge Stratus, exited the car, got behind it, and "fired . . . shots" at Madrazo. Appellant, who had reached a nearby "wall," also "started shooting," "rapidly" and "venomous[ly]," at Madrazo. All four men "fired simultaneously" at Madrazo "from different angles" until they "felt that the police were close by" and "took off running." Based on his experience "working at game rooms," Madrazo opined that appellant had come to the game room to commit a robbery, and Madrazo was "afraid for [his] life" when appellant "pulled" out a gun.

Medina, an employee at the game room, similarly testified that two men "walked in" and "wanted to take [Madrazo's] gun

away from him." When the two men tried to take Madrazo's gun, "one of the two men" shot his gun.

Further, Butler, a member of the game room, testified that "at the time" of the shooting, Madrazo was standing inside the lobby when a "guy" outside of the game room tried to enter by pushing the front door open. Because Madrazo told the "guy" that he could not enter, the "guy" shot a gun. After the gun "went off," Madrazo "grabbed his gun and went out the door." There was "shooting everywhere," with "bullets ... coming from everywhere." "[S]everal shots" were fired at Madrazo.

Young, who "gamble[d]" at the game room, testified that he saw a Dodge Stratus abnormally parked directly in front of the game room. He then saw the security officer and another "guy" "tussling." When the security officer "kicked" at the other "guy," the "guy" pulled out his gun and "started shooting" at the security officer. Several other "guys" then exited the Dodge Stratus, and "at least three" of the men, "[f]ire[d] their weapon[s]" in the direction of the security officer. The "guy," with whom the security officer had the "confrontation," was one of the men "shooting." Young explained that he had been "concern[ed]" about "getting robbed" at the game room because "it happen[ed] a lot."

In regard to the presence of money in the game room, Medina testified that she had previously "see[n] a large amount of cash" in the game room's office. Similarly, Young explained that he had "gamble[d]" at the game room "[m]any times" and had won "a little bit more" than $2,000 there.

The game room had "about a hundred and something games," and members "gamble[d]" with cash, namely "[h]undreds, fifties, twenties, [and] tens." The game room also had an "ATM" machine, and it was "possible ... to win a substantial amount of money," as much as $20,000, at the game room. Further, Butler testified that the game room contained "[s]lot machines," into which a person would "put money" and "could win up to $600 or $700 ... or $1,000."

Finally, Pham testified about the contents of the cellular telephone recovered by Deputy Clayton from the top of the Dodge Stratus on the day of the shooting.[14] The cellular telephone contained photographs of appellant, including "selfies" of appellant, photographs of appellant in the "nude," and at least one photograph of appellant holding the cellular telephone itself. The cellular telephone also had "uploaded" onto it an email account in appellant's name and a "chat log" from "Facebook messenger," which showed messages from a Facebook account in appellant's name.

In regard to the text messages that were sent from and received by the cellular telephone, Pham explained that messages dated June 21, 2012 discussed a "[M]exican" security officer, his whereabouts, and the fact that he carried a gun. Several messages discussed the location of the people who had "the money," "[h]ow many people" were on the "floor," whether "machine[s]" had been "empt[ied]," the location of certain rooms, including a "[m]oney room" and an "employees only room," where "scrill," i.e., money, would be "count[ed]," and an "escape route."[15]

---

14. Deputy Clayton recovered from "the rear deck, the rear trunk lid" of the Dodge Stratus, a handprint that matched appellant's known handprint.

15. To the extent that appellant asserts that this Court cannot consider the text messages retrieved from the cellular telephone recovered by Deputy Clayton from the top of the Dodge Stratus, we note that when conducting

■ Although appellant asserts that "[n]o witness testified that he attempted to obtain control over their property" and there is "no evidence that he ever 'demanded any money,'" we note that the intent to obtain or maintain control of property may be inferred from appellant's actions and a verbal demand for money or property is not required. *Johnson v. State*, 541 S.W.2d 185, 187 (Tex.Crim.App. 1976); *Birl v. State*, 763 S.W.2d 860, 863 (Tex.App.–Texarkana 1988, no pet.); *Chastain v. State*, 667 S.W.2d 791, 795 (Tex. App.–Houston [14th Dist.] 1983, pet. ref'd). Further, proof of a completed theft is not required to establish the commission of an aggravated robbery; thus, the fact that appellant did not actually succeed in taking any money or property is of no moment. *Robinson v. State*, 596 S.W.2d 130, 134 (Tex.Crim.App.1980); *see also* Tex. Penal Code Ann. § 29.01 ("[i]n the course of committing theft" means conduct occurring in attempt to commit theft).

The instant case is similar to a case previously decided by our sister court. *See King v. State*, 157 S.W.3d 873 (Tex. App.–Houston [14th Dist.] 2005, pet. ref'd). In *King*, the defendant and another man entered a grocery store. *Id.* at 874. While the other man was "obtaining change for a dollar" from the store's owner, the defendant "took a gun from his backpack" and "pointed it at" the owner. *Id.* The defendant "fired one shot" at the owner, who ducked under the counter and retrieved "his own weapon," which he then fired as the defendant fled the premises. *Id.* While noting that the "actual commission of theft is not a prerequisite to the commission of robbery" and the "[i]ntent to steal may be inferred from a[ ] [defen-

dant's] actions or conduct," the court held that "a rational jury could have inferred from [the defendant's] conduct that he intended to rob" the store owner. *Id.* at 874–75; *see also Chastain*, 667 S.W.2d at 795 ("While no one heard [defendant] or his accomplice actually demand money from the attendant," "the attendant was shot," and "there was sufficient evidence to allow the jury to find that [defendant] w[as] acting with intent to obtain control of the money under the attendant's care, custody, and control.").

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the jury could have reasonably found that appellant, while in the course of committing a theft and with the intent to obtain or maintain control of property, used or exhibited a deadly weapon, placing Madrazo in fear of imminent bodily injury or death. Accordingly, we hold that the evidence is sufficient to support appellant's conviction for the offense of aggravated robbery.

We overrule appellant's third and fourth issues.

## Motion to Suppress

In his first issue, appellant argues that the trial court erred in denying his motion to suppress evidence retrieved from the cellular telephone recovered by Deputy Clayton from the top of the Dodge Stratus because the search warrant obtained by law enforcement officers was "general" and allowed for an "overbroad" search of the contents of the cellular telephone.

■ We review a trial court's denial of a motion to suppress evidence under a

a sufficiency review, we "must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible." *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App.1999); *see also Conner v.*

*State*, 67 S.W.3d 192, 197 (Tex.Crim.App. 2001) ("When conducting a sufficiency review, we consider all the evidence admitted, whether proper or improper.").

bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex.Crim. App.2013). We review the trial court's factual findings for an abuse of discretion and the trial court's application of the law to the facts de novo. *Id.* At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex.Crim.App.2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim.App.2000). When, as here, a trial judge does not make explicit findings of fact, we review the evidence in a light most favorable to the trial court's ruling. *Walter v. State*, 28 S.W.3d 538, 540 (Tex.Crim. App.2000). Almost total deference should be given to a trial court's implied findings, especially those based on an evaluation of witness credibility or demeanor. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex.Crim. App.2010). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.* at 447–48.

 The Fourth Amendment of the United States Constitution and Article I, Section 9 of the Texas Constitution protect individuals from unreasonable searches and seizures. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9; *State v. Betts*, 397 S.W.3d 198, 203 (Tex.Crim.App.2013). The rights secured by the Fourth Amendment and Article I, Section 9 are personal, and, accordingly, an accused has standing to challenge the admission of evidence obtained by an "unlawful" search or seizure only if he had a legitimate expectation of privacy in the place invaded. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978); *Betts*, 397 S.W.3d at 203. A defendant who challenges a search has the burden of proving facts demonstrating a legitimate expectation of privacy. *Betts*, 397 S.W.3d at 203; *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996). He must show that he had a subjective expectation of privacy in the place invaded and that society is prepared to recognize that expectation of privacy as objectively reasonable. *Betts*, 397 S.W.3d at 203; *Villarreal*, 935 S.W.2d at 138; *see also Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

 A party lacks standing to object to the reasonableness of a search of abandoned property. *McDuff v. State*, 939 S.W.2d 607, 616 (Tex.Crim.App.1997); *see also State v. Granville*, 423 S.W.3d 399, 409 (Tex.Crim.App.2014) ("Although a person may have a reasonable and legitimate expectation of privacy in the contents of his cell phone, he may lose that expectation ... if he abandons his cell phone...."); *Gonzales v. State*, 190 S.W.3d 125, 135 (Tex.App.–Houston [1st Dist.] 2005, pet. ref'd). Abandonment of property occurs when a defendant intends to abandon the property and his decision to abandon it is not due to law enforcement misconduct. *McDuff*, 939 S.W.2d at 616; *Citizen v. State*, 39 S.W.3d 367, 372 (Tex.App.–Houston [1st Dist.] 2001, no pet.). "When police take possession of property abandoned independent of police misconduct[,] there is no seizure under the Fourth Amendment." *McDuff*, 939 S.W.2d at 616. Abandonment is primarily a question of intent that can be inferred from the words and actions of the party and other circumstances surrounding the alleged abandonment. *Id.; Tankoy v. State*, 738 S.W.2d 63, 66 (Tex.App.–Houston [1st Dist.] 1987, no pet.). The dispositive issue is whether the accused voluntarily discarded, left behind, or otherwise relinquished his interest in property so that he could no longer retain a reasonable

expectation of privacy with regard to it at the time of the search. *McDuff*, 939 S.W.2d at 616.

Here, appellant does not argue, and there is no evidence, that any potential law enforcement misconduct led to his alleged abandonment of the cellular telephone.[16] Therefore, our analysis focuses on whether appellant intended to abandon the cellular telephone.

On June 21, 2012, appellant was one of four men inside of a Dodge Stratus that was parked directly in front of the game room in an "[ab]normal" place in the parking lot. Appellant and another man "got out" of the car and approached the game room. After "pull[ing] out a gun" and "practically" putting it in Madrazo's face, appellant fired his gun and "took off running."

When Madrazo followed appellant out of the game room, the two men who had remained in the Dodge Stratus, exited the car, got behind it, and "fired ... shots" at Madrazo. Appellant ran for "safe[ty]" to a nearby "wall" and then continued shooting, "rapidly" and "venomous[ly]," at Madrazo. However, when appellant and the three other men "felt that the police were close by," they "took off running," leaving the car parked directly in front of the game room. *Cf. Matthews v. State*, 431 S.W.3d 596, 610 (Tex.Crim.App.2014) (defendant "abandoned his reasonable expectation of privacy in the van when he fled" from law enforcement officers); *Gonzales*, 190 S.W.3d at 135 (defendant abandoned car

he left in parking lot, not parked in parking space, with its door open and items inside); *see also Royston v. State*, No. 14–13–00920–CR, 2015 WL 3799698, at *3–5 (Tex.App.–Houston [14th Dist.] June 18, 2015, pet. ref'd) (mem. op., not designated for publication) (defendant abandoned cellular telephone when he left it in public dressing room and walked away).

Upon his arrival at the scene, Deputy Clayton conducted an investigation and "processed" the area near the game room. He "took photographs," "collected" evidence, and searched "the Dodge Stratus that was parked in front of the game room." According to Clayton, the car was not "moved by police officers" and remained in the same position, i.e., parked in front of the game room, it was in when law enforcement officers "arrived on the scene." From the car, Clayton recovered, among other items, the cellular telephone that had been "left on top of the vehicle." [17]

We conclude that appellant has not shown that he had a reasonable expectation of privacy in the cellular telephone that was abandoned and "left" on top of the Dodge Stratus, and, therefore, appellant lacks standing to complain of the reasonableness of the search of the contents of the cellular telephone. *See Swearingen v. State*, 101 S.W.3d 89, 101 (Tex.Crim. App.2003) ("[W]hen a defendant voluntarily abandons property, he lacks standing to contest the reasonableness of the search of the abandoned property."); *Gonzales*, 190 S.W.3d at 135. Accordingly, we hold that

---

16. We also note that law enforcement misconduct could not have caused appellant to abandon the cellular telephone because by the time the "first [law enforcement] officer" arrived at the scene, the shooting had stopped and appellant had already left the premises. *Cf. Bernard v. State*, No. 01–03–00188–CR, 2004 WL 396449, at *3 (Tex.App.–Houston [1st Dist.] Mar. 4, 2004, no pet.) (mem. op., not designated for publication) ("Police mis-

conduct could not have caused [defendant] to abandon the bag[, placed behind the car's backseat headrest,] because the officers ... had not yet arrived at the car.").

17. The trial court also admitted into evidence several photographs of the cellular telephone sitting on top of the front-passenger side of the Dodge Stratus.

the trial court did not err in denying appellant's motion to suppress evidence.[18]

We overrule appellant's first issue.

### Admission of Evidence

In his second issue, appellant argues that the trial court erred in admitting text messages retrieved from the cellular telephone recovered by Deputy Clayton because they were not "properly authenticated." *See* TEX. R. EVID. 901.

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex.Crim.App.2011); *Walker v. State*, 321 S.W.3d 18, 22 (Tex. App.–Houston [1st Dist.] 2009, pet. dism'd). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.Crim.App.1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex.Crim. App.1996) (internal quotations omitted).

We may not determine whether a trial court erred in the admission of evidence unless error is preserved for our review. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex.Crim.App.2003). To preserve the issue of erroneously admitted evidence, a party must make a timely and specific objection and obtain a ruling from the trial court. TEX. R. APP. P. 33.1(a); *Martinez*, 98 S.W.3d at 193. "The purpose of requiring a specific objection in the trial

court is twofold: (1) to inform the trial [court] of the basis of the objection and give [it] the opportunity to rule on it; [and] (2) to give opposing counsel the opportunity to respond to the complaint." *Resendez v. State*, 306 S.W.3d 308, 312 (Tex.Crim.App.2009). A party "must be specific enough so as to 'let the trial [court] know what he wants, why he thinks himself entitled to it, and do so clearly enough for the [trial court] to understand him at a time when the trial court is in a proper position to do something about it.'" *Id.* at 313 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex.Crim.App.1992)). Also, a party fails to preserve error when the contention urged on appeal does not comport with the specific complaint made in the trial court. *See Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex.Crim.App.2009); *Rothstein v. State*, 267 S.W.3d 366, 373 (Tex.App.–Houston [14th Dist.] 2008, pet. ref'd).

We consider the context of the complaint to determine if the party preserved error. *Resendez*, 306 S.W.3d at 313. If the correct ground for exclusion was obvious to the trial court and opposing counsel, waiver will not result from a general or imprecise objection. *Zillender v. State*, 557 S.W.2d 515, 517 (Tex.Crim.App. 1977). However, if the context shows that a party failed to effectively communicate his argument, then the error is deemed waived on appeal. *Lankston*, 827 S.W.2d at 909.

Appellant does not direct the Court to the specific text-messages that he asserts the trial court improperly admitted into

---

**18.** Having concluded that appellant has not shown that he had a reasonable expectation of privacy in the cellular telephone, we need not address his argument that the search warrant obtained by law enforcement officers was "general" and allowed for an "overbroad" search of the cellular telephone's contents.

*See Valtierra v. State*, 310 S.W.3d 442, 447–48 (Tex.Crim.App.2010) ("We will sustain the trial court's ruling if that ruling is reasonably supported by the record and is correct on any theory of law applicable to the case." (internal quotations omitted)); *see also* TEX. R. APP. P. 47.1.

evidence. Our review of the record indicates that State's Exhibits 200, 201, 203, 205, and 208 contain text messages sent from and received by the cellular telephone.[19] Notably, however, appellant failed to object to the admission of any of these exhibits on the basis of improper authentication.

Here, when the State sought to admit State's Exhibits 200–08, appellant generally objected based on "relevance" and "prejudice."[20] Appellant then made the following objections specifically regarding the text-message exhibits:

> [Appellant's Counsel]: I would like a running objection to State's Exhibit 208 from my prior objection and my Motion to Suppress.... In addition to that, I would like to object to State's Exhibit 208, to the relevance of this document. And I would like to object to the text messages that talk about sexual—that are sexually explicit, as to[o] prejudicial to the defendant and that the probative value does not outweigh the undo prejudice of that particular exhibit of text messages.
>
> . . .
>
> [Appellant's Counsel]: And I have the same objection to State's Exhibit 201. I would like to make a running objection on my Motion to Suppress in addition to that, the private explicit nature of these texts, stating that they are extremely prejudicial to my client and the probative value does not substantially outweigh the undue prejudice.
>
> . . .

> [Appellant's Counsel]: I would like to state the same objection for State's Exhibit 200.
>
> [Appellant's Counsel]: I would like to make the same objections to State's Exhibit 203, as well as foundation.
>
> . . .
>
> [Appellant's Counsel]: ... I would like to make the same objections to State's Exhibit 205, improper foundation.

■ Although appellant complains on appeal that State's Exhibits 200, 201, and 208 lacked proper authentication, he did not raise an improper authentication objection with respect to these exhibits at trial. Accordingly, we hold that appellant did not preserve his complaint in regard to State's Exhibits 200, 201, and 208 for our review. *See Lovill*, 319 S.W.3d at 691–92 (error not preserved when contention urged on appeal does not comport with specific complaint made in trial court); *Rothstein*, 267 S.W.3d at 373 ("An objection stating one legal theory may not be used to support a different legal theory on appeal.").

■ In regard to State's Exhibits 203 and 205, appellant objected to their admission based on "foundation" and "improper foundation," respectively. However, an objection to the admission of evidence must be reasonably specific enough so as to apprise the trial court of its legal basis, and a defendant must inform the trial court how the predicate is deficient; a mere objection of improper predicate is not sufficient. *See Bird v. State*, 692 S.W.2d 65, 70 (Tex.Crim.App.1985); *Hernandez v. State*, 53 S.W.3d 742, 745 (Tex. App.–Houston [1st Dist.] 2001, pet. ref'd);

---

**19.** We note that State's Exhibit 203 contains "MMS Messages," rather than "SMS Messages," and was discussed at trial only in regard to the e-mails that it contained. However, out of an abundance of caution, we will address this exhibit in conjunction with the other text-message exhibits in the record.

**20.** State's Exhibits 202, 204, 206, and 207 do not contain text messages.

*Jones v. State*, 825 S.W.2d 470, 472 (Tex. App.–Corpus Christi 1991, pet. ref'd).

Here, appellant's objections of "foundation" and "improper foundation" were too general and not specific enough to advise the trial court of his complaint that the exhibits had not been properly authenticated as required by Texas Rule of Evidence 901. *See* Tex. R. App. P. 33.1(a); *Bird*, 692 S.W.2d at 70; *see also Pendley v. State*, No. 2–03–111–CR, 2004 WL 2712109, at *6 (Tex.App.–Fort Worth Nov. 24, 2004, pet. ref'd) (mem. op., not designated for publication) (defendant's objection "that the proper foundation had not been laid" for admission of videotapes "too general to apprise the trial court of his specific complaint" regarding authentication). And appellant did not inform the trial court of any defect in the authentication of State's Exhibits 203 and 205.[21]

Accordingly, we hold that appellant also did not preserve for our review his improper-authentication complaint in regard to State's Exhibits 203 and 205.

We overrule appellant's second issue.

### Modification of Judgments

We note that the trial court's written judgments do not accurately comport with the records in these cases in that they state "Not True" in regard to appellant's "[p]lea to 1st [e]nhancement [p]aragraph." Here, the records reveal that appellant pleaded "True" to the allegation in the enhancement paragraph in each indictment that he had previously been convicted of the felony offense of aggravated robbery.

"[A]ppellate court[s] ha[ve] the power to correct and reform a trial court judgment 'to make the record speak the truth when it has the necessary data and information to do so, or make any appropriate order as the law and nature of the case may require.'" *Nolan v. State*, 39 S.W.3d 697, 698 (Tex.App.–Houston [1st Dist.] 2001, no pet.) (quoting *Asberry v. State*, 813 S.W.2d 526, 529 (Tex.App.–Dallas 1991, pet ref'd)). Although neither party addresses the inconsistency between the trial court's written judgments and the records in these cases, we, based on our review, conclude that the portions of the judgments regarding appellant's pleas as to the allegation in the enhancement paragraph do not accurately comport with the records. *See Asberry*, 813 S.W.2d at 529–30 (authority to reform incorrect judgment not dependent upon request of any party).

Accordingly, we modify the trial court's judgments to reflect that appellant pleaded "True" to the "1st [e]nhancement [p]aragraph" in each indictment. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex.Crim.App.1993); *Torres v. State*, 391 S.W.3d 179, 185 (Tex.App.–Houston [1st Dist.] 2012, pet. ref'd) (modifying judgment to state defendant pleaded "true" to allegations in enhancement paragraphs).

### Conclusion

We affirm the judgments of the trial court as modified.

Jennings, J., concurring.

---

**21.** We also note that some of the text messages contained in State's Exhibits 203 and 205, particularly those from June 21, 2012, the day of the shooting, are also contained in State's Exhibits 200, 201, and 208, to which appellant did not object on the basis of improper authentication. *See Hudson v. State*, 675 S.W.2d 507, 511 (Tex.Crim.App.1984) ("[A]n error in admission of evidence is cured where the same evidence comes in elsewhere without objection. . . . ").

## CONCURRING OPINION

I write separately to further explain why although this Court has a duty to address the factual-sufficiency challenge of appellant, Travis Marcellaus Edwards, in accord with the Factual–Conclusivity Clause of the Texas Constitution,[1] I agree that we must, at this time, overrule his challenge in light of this Court's precedent in *Ervin v. State*, 331 S.W.3d 49 (Tex.App.–Houston [1st Dist.] 2010, pet. ref'd).

In his fourth issue, appellant argues that the evidence is factually insufficient to support his conviction for the offense of aggravated robbery because, "[v]iewing all of the evidence in a neutral light, no rational jury could [have] f[ound] beyond a reasonable doubt that [he] had the intent to obtain and maintain control of [the complainant's] property." He also asserts in his fourth issue that if this Court "fails to conduct a factual sufficiency review," as required by the Texas Constitution, he "will be denied due process of law." *See* U.S. Const. amends. V ("No person shall be ... deprived of life, liberty, or property, without due process of law...."), XIV, § 1 ("No State shall ... deprive any person of life, liberty, or property, without due process of law...."); TEX. CONST. art. I, § 19 ("No citizen of this State shall be deprived life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."); *id.*, art. V, § 6(a) ("[T]he decision of [the Texas Courts of Appeals] shall be conclusive on all questions of fact brought before them on appeal or error.").

I agree that not addressing appellant's factual-sufficiency challenge in accord with the Factual–Conclusivity Clause violates his rights to due process and equal protection of law. *See Bearnth v. State*, 361

S.W.3d 135, 146–47 (Tex.App.–Houston [1st Dist.] 2011, pet. ref'd) (Jennings, J., concurring); *Kiffe v. State*, 361 S.W.3d 104, 110–19 (Tex.App.–Houston [1st Dist.] 2011, pet. ref'd) (Jennings, J., concurring); *Mosley v. State*, 355 S.W.3d 59, 73–77 (Tex.App.–Houston [1st Dist.] 2010, pet. ref'd) (Jennings, J., concurring); *Kibble v. State*, 340 S.W.3d 14, 24–27 (Tex.App.–Houston [1st Dist.] 2010, pet. ref'd) (Jennings, J., concurring); *Ervin*, 331 S.W.3d at 56–70 (Jennings, J., concurring); *see also Ibe v. State*, No. 01–12–00422–CR, 2014 WL 1058129, at *3 n. 1 (Tex.App.–Houston [1st Dist.] Mar. 18, 2014, no pet.) (mem. op., not designated for publication) (panel acknowledging failure to address defendant's question of fact violated United States Constitution's guarantees of due process of law and equal protection of laws); *Fisher v. State*, No. 01–11–00516–CR, 2013 WL 4680226, at *4–5 (Tex.App.–Houston [1st Dist.] Aug. 29, 2013, pet. ref'd) (mem. op., not designated for publication) (same).

As the Texas Court of Criminal Appeals clearly explained, as recently as 2009, in addition to being supported by legally-sufficient evidence, under Texas law,

A verdict must also be supported by factually sufficient evidence. But unlike a legal sufficiency review, which is a federal due process requirement, a *factual sufficiency review is a creature of state law*. On direct appeal, a court must begin its factual sufficiency review with the assumption that the evidence is legally sufficient under *Jackson*.[2] *Evidence that is legally sufficient, however, can be deemed factually insufficient in two ways: (1) the evidence supporting the conviction is "too weak" to support the factfinder's ver-*

---

1. TEX. CONST. art. V, § 6(a).

2. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*dict, or (2) considering conflicting evidence, the factfinder's verdict is "against the great weight and preponderance of the evidence."* When a court of appeals conducts a factual sufficiency review, it must defer to the jury's findings. We have set out three "basic ground rules" implementing this standard. First, the court of appeals must consider all of the evidence in a neutral light, as opposed to in a light most favorable to the verdict. Second, the court of appeals may only find the evidence factually insufficient when necessary to "prevent manifest injustice." Although the verdict is afforded less deference during a factual sufficiency review, the court of appeals is not free to override the verdict simply because it disagrees with it. Third, the court of appeals must explain why the evidence is too weak to support the verdict or why the conflicting evidence greatly weighs against the verdict. This requirement serves two related purposes. First, it supports the court of appeals's judgment that a manifest injustice has occurred. And second, it assists us in ensuring that the standard of review was properly applied.

*Laster v. State,* 275 S.W.3d 512, 518 (Tex. Crim.App.2009) (Keasler, J., joined by Keller, P.J., Meyers, Womack & Hervey, JJ.) (emphasis added) (internal citations omitted).

In regard to appellate challenges based on the factual insufficiency of the evidence in Texas courts of appeals, the Factual–Conclusivity Clause of the Texas Constitution provides in no uncertain terms that:

[T]he decision of [the Texas Courts of Appeals] shall be conclusive on all *questions of fact* brought before them on appeal or error.

Tex. Const. art. V, § 6(a) (emphasis added). The original intent of the drafters of the clause is clear. The clause "requires" that Texas courts make a "distinction" between questions of law and questions of fact. *Sw. Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 621 (Tex.2004). As clearly explained, again by the Texas Court of Criminal Appeals, in *Laster.*

Unlike our jurisdiction over legal sufficiency decisions, our jurisdiction over the court of appeals's factual sufficiency decisions is limited. *The Factual Conclusivity Clause gives final appellate jurisdiction to the court of appeals on questions of fact brought before the court.* We review the court of appeals's factual sufficiency analysis to ensure that the court applied the correct legal standard and considered all of the relevant evidence. We do not conduct a de novo factual sufficiency review. If we determine that the court of appeals applied the wrong standard or misapplied the correct standard, the case must be remanded to the court of appeals to conduct a proper factual sufficiency review.

275 S.W.3d at 518–19 (emphasis added) (internal citations omitted).

Thus, under the Factual–Conclusivity Clause, this Court has a duty to address appellant's question of fact as a question of fact, i.e., by neutrally considering and weighing all the evidence in the record, including that which is contrary to the jury's verdict. *Id.; Cain v. State,* 958 S.W.2d 404, 408 (Tex.Crim.App.1997); *Ex parte Schuessler,* 846 S.W.2d 850, 852 (Tex.Crim.App.1993); *Meraz v. State,* 785 S.W.2d 146, 153 (Tex.Crim.App.1990); *see also Pool v. Ford Motor Co.,* 715 S.W.2d 629, 633–35 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). Moreover, the Texas Legislature has expressly directed, consistent with the Factual–Conclusivity Clause, that Texas Courts of Appeals "may reverse the judg-

ment in a criminal action ... upon the facts." Tex.Code Crim. Proc. Ann. art. 44.25 (Vernon 2006). Indeed, it is well-settled that it is reversible error for a court of appeals to address a question of fact as a question of law. *In re King's Estate*, 244 S.W.2d at 661–62; *see also Ex parte Schuessler*, 846 S.W.2d at 852; *Meraz*, 785 S.W.2d at 153.

However, the Texas Court of Criminal Appeals, disregarding the plain language of Article V, Section 6 of the Texas Constitution, the plain language of Article 44.25 of the Texas Code of Criminal Procedure, decades-old precedent of the Texas Supreme Court, and its own well-established precedent, has purported to "abolish[ ]" factual-sufficiency review in criminal cases in Texas. *Howard v. State*, 333 S.W.3d 137, 138 n. 2 (Tex.Crim.App.2011). In two separate opinions, the court concluded that in criminal cases, "a legal-sufficiency [appellate] standard [of review is] 'indistinguishable' from a factual-sufficiency [appellate] standard" of review. *Brooks v. State*, 323 S.W.3d 893, 901 (Tex.Crim.App. 2010) (Hervey, J., joined by Keller, Keasler & Cochran, JJ.); *see id.* at 912–26 (Cochran, X, joined by Womack, X, concurring) (overruling use in criminal cases of factual-sufficiency appellate standard of review, which was consistent with Texas Supreme Court precedent and articulated in *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim.App.1996)).

Subsequently, this Court, in light of the Texas Court of Criminal Appeal's plurality opinions in *Brooks*, decided to answer questions of fact in criminal appeals as pure questions of law by applying the legal-sufficiency appellate standard of review to fact questions and viewing the evidence in the light most favorable to the prosecution, not neutrally reweighing it. *See Ervin*, 331 S.W.3d at 52–56. Although the majority in *Ervin* erred in doing so,

this Court did have jurisdiction to so err, and, until this Court or a higher court overrules *Ervin*, we must accept it as binding precedent. *See Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex.1964).

Given the express language of Article V, Section 6 of the Texas Constitution and Article 44.25 of the Texas Code of Criminal Procedure, it is readily apparent that answering appellant's question of fact as a purely legal question violates the United States Constitution's guarantee of due process of law, as well as its guarantee of the equal protection of the laws, because it, in fact, deprives him of his well-established Texas appellate remedy of a new trial, recognized in the Texas Constitution and by the Texas Legislature in Article 44.25. *See* U.S. Const. amends. V, XIV; *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956) (concluding in states providing for appellate review, criminal defendant entitled to protections afforded under Due Process and Equal Protection Clauses of United States Constitution); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 111, 117 S.Ct. 555, 561, 136 L.Ed.2d 473 (1996) ("This Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts." (internal quotations omitted)).

Moreover, given that the Texas Supreme Court, in reading Article V, Section 6 of the Texas Constitution, clearly recognizes the right of civil litigants to present intermediate courts of appeals with questions of fact and the remedy of a remand for a new trial, the denial of that right, given that Article V, Section 6 is not in any way limited to civil cases, amounts to a denial of the equal protection of the law. *See* U.S. Const. amend. XIV. "There is no

sound basis for the disparate interpretations of a single constitutional provision based on whether the matter on appeal is civil or criminal in nature." Susan Bleil & Charles Bleil, *The Court of Criminal Appeals Versus the Constitution: The Conclusivity Question*, 23 St. Mary's L.J. 423, 424 (1991).

Although Texas Courts of Appeals have only rarely found evidence factually insufficient to support criminal convictions or findings in civil cases, the right of a defendant in a criminal case or a litigant in a civil case to assert a question of fact on appeal and request a remand for a new trial is critical and in no way interferes with the right to trial by jury. As explained by former Texas Supreme Court Chief Justice Thomas Phillips:

> Appellate courts have the authority to review the sufficiency of evidence in support of the fact finder's determinations for one reason: *to undo the effect of an unjust trial.* This traditional judicial function, now exercised only by our intermediate appellate courts, neither conflicts with nor infringes upon the right of trial by jury. No appeals court in Texas has ever been given, or has ever exercised, the authority to *find* any fact. *The extent of an appellate court's power is, as it has always been, to remand for new trial if more than a scintilla of probative evidence exists to support the result reached by the jury.*
>
> This authority exists regardless of whether the court of appeals is reviewing a jury's finding or its "non-finding," that is, the failure of a jury to find a fact. *In either case, the court is not substituting its own finding for the jury's; it is merely ordering a new trial before another jury for a new determination.*
>
> *The court of appeals must have this authority in order to do justice.* Trials

may be just as unfair when the party with the burden of proof unjustly loses as when the party with the burden of proof unjustly wins. *To fulfill its constitutional responsibilities,* the court of appeals must have authority to review both findings and non-findings.

*Herbert v. Herbert,* 754 S.W.2d 141, 145 (Tex.1988) (Phillips, C.J., concurring) (emphasis added) (internal citations omitted).

In sum, the Factual–Conclusivity Clause of the Texas Constitution provides a much-needed and critical fail-safe against manifestly unjust convictions that are based on evidence that is factually insufficient, although legally sufficient. And, respectfully, neither this Court, nor the Texas Court of Criminal Appeals has the legitimate power to "abolish" this constitutionally guaranteed right. *See Ex parte Schuessler,* 846 S.W.2d at 852–53 (court of criminal appeals does not have authority to "create[ ] a standard of review for the courts of appeals that contravene[s] the Texas Constitution"); *see also M.L.B.,* 519 U.S. at 111, 117 S.Ct. at 561 ("This Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts." (internal quotations omitted)). As previously explained by the court of criminal appeals:

> The court of appeals is ... constitutionally given the authority to determine if a jury finding is against the great weight and preponderance of the evidence and if this is improper it is up to the people of the State of Texas to amend the Constitution.

*Meraz,* 785 S.W.2d at 154.