

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-16-00384-CR

FARHAN AWAN                                                         APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY
TRIAL COURT NO. 1434446D

----------

## MEMORANDUM OPINION[1]

----------

In three points, Appellant Farhan Awan appeals his conviction for continuous sexual abuse of a child.  *See* Tex. Penal Code Ann. § 21.02 (West Supp. 2017).  We affirm.

---
[1]*See* Tex. R. App. P. 47.4.

**Background**

## I.  Appellant's abuse of A.B.

In 2003, five-year-old A.B.[2] emigrated from Pakistan to Bedford, Texas, with her recently-married Mother, her Stepfather, and her Stepfather's two older children—Stepbrother and Stepsister.[3]  They moved into a small, two-bedroom apartment in Bedford and soon after the move, Mother gave birth to another son, Brother.

### A.  The abuse began shortly after Appellant moved into A.B.'s apartment.

In December 2007, A.B. was 10 years old when her Stepfather's brother (Uncle) and his son, Appellant, also emigrated from Pakistan and moved into the small Bedford apartment with her family.  The addition of two more residents in the apartment created crowded conditions.  Mother, Stepfather, A.B., and Brother slept in one bedroom where Mother and Brother shared a bed, A.B. slept on a "fold-away" bed, and Stepfather slept on the floor.  Appellant, who was in his early 20s, shared the second bedroom with Stepbrother,[4] while Uncle slept in the living room on a couch.

---

[2]To protect their privacy and for convenience, we will refer to the complainant and family members by initials and in terms of their relation to A.B. *See* 2nd Tex. App. (Fort Worth) Loc. R. 7; *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982); *see also* Tex. R. App. P. 9.8(b) & cmt.

[3]Stepbrother and Stepsister are 10-15 years older than A.B.

[4]At this point, Stepsister was no longer living in the apartment.

When Appellant arrived in Bedford, the family trusted him. He was thought to be very religious, responsible, and trustworthy, and he was the go-to person for help with any technological issues. But shortly after his arrival, Appellant became inappropriately affectionate toward A.B. At trial, A.B. testified that it began when Appellant invited her to play a video game with him. Playing the video game led to a game of keep-away with an orange foam ball. According to A.B., whenever she had the ball, Appellant would wrap himself around her as if to grab the ball but would actually grab her breasts and vagina over her clothes instead. A.B. testified that she knew his touching was inappropriate, and she told him to stop. But while Appellant promised to stop, he continued touching her inappropriately whenever they played the game. And A.B. testified that they played every night for a few weeks.

Eventually, things progressed further. One night while A.B. was sitting in Appellant's lap on the living room couch watching TV, he touched her breast underneath her shirt. A.B. testified that, although she knew the touching was inappropriate and it scared her, she did not think she could stop him.

Undeterred, Appellant began touching A.B. more often. A.B. recounted for the jury how, after school or at night, Appellant would reach under her clothes and touch her genital area while she sat in his lap in front of the computer—a computer he used to show her pornographic websites and videos. A.B. estimated that Appellant touched her in this manner at least 10 to 15 times while he was living in the family apartment.

Appellant became bolder with his abuse, too. A.B. testified, "There were several times where he would make me like bend over the couch and he would like dry hump me from behind. He would just grab me in random places like around the apartment."

Although Mother was not employed outside the home and was present when these abusive acts occurred, she was usually out of sight in the kitchen. Mother and A.B. testified that, consequently, Mother was unaware of what was taking place. Appellant actively deterred A.B. from telling Mother. As A.B. testified, "There were several times when I threatened to tell my mom and I would try to pull away from him and go get my mom, but he made it very clear that she wouldn't believe me." At one point, A.B. did attempt to tell Mother about the abuse, but when she told Mother that Appellant was "watching naked people on the computer," Mother scolded A.B., telling her not to speak of it again and that, even if Appellant was doing such a thing, it was none of their business.

A.B. alleged at trial that both Stepfather and Mother had observed separate incidences of abuse. According to A.B., Stepfather saw Appellant touching her breasts beneath her shirt while they watched television and immediately told Mother about it, but Mother dismissed Stepfather's concerns, telling him that he must have been mistaken. When Mother questioned A.B. about Stepfather's concern, according to A.B., she lied and denied that it happened. Another time, according to A.B., Mother observed Appellant humping

4

A.B. while she was bent over the couch, but said nothing until Appellant left the apartment, at which point she told A.B. not to allow someone to do that to her.

**B.    The abuse continued when Uncle and Appellant moved to their own apartment.**

After about four months, in April 2008, Uncle and Appellant moved into a one-bedroom apartment within the same apartment complex, about a minute's walk from A.B.'s apartment.  In the next four or five months, at Mother's urging, A.B. and her little brother, who was about three or four years old, visited Appellant at his apartment at least twice a week after school while Uncle was at work.  During these visits, while her brother entertained himself with toys, Appellant continued his routine of touching A.B.'s genitals while she was sitting in his lap and forcing her to watch pornography, often explaining what was happening in the pornographic scenes.  A.B. estimated that this happened approximately 25 times in Uncle and Appellant's apartment.  According to A.B., on three or four occasions, Appellant took her into the closet, turned out the lights, and pretended to be a police officer conducting a pat-down search over and under A.B.'s clothes.

Over time, Appellant grew even bolder.  A.B. recounted an instance in which Appellant forced A.B. to lie down on a bed and, according to A.B., he laid on top of her and "practice[d] missionary" by humping her and moaning.  Another time, Appellant lifted A.B.'s shirt and put his mouth on her nipples.  Finally, Appellant attempted to have penetrative sex with A.B.  On that occasion,

5

according to A.B., Appellant made her bend over the bed, took her pants off, and "was rubbing his penis onto [her] butt and he kept asking [her] where [her] hole was." Still only 10 years old at the time, A.B. did not understand. As she described to the jury,

> And so I felt his penis on my butt because it was wet and he kept taking it in and out. And at one point during that instance I felt a really sharp pain in my vagina and at that point, like, I screamed and I told him it really hurt and he apologized. And he kept saying, like, I won't do it again, and then he just got up and he went to the bathroom and he showered.

**C.    Appellant continued to abuse A.B. once he moved to an apartment across the hall from hers.**

Later in 2008, the rest of Appellant's family moved to Bedford from Pakistan, and they all moved into a two-bedroom apartment directly across from A.B.'s apartment. When A.B. visited Appellant's new apartment, he grabbed her by the wrist and informed her it would be the last time they could "do anything" because his family was moving in. According to A.B., he kept hold of her wrist, refusing to let her leave the apartment, but she finally managed to break free and return to her own apartment.

Unfortunately, Appellant's statement did not prove to be true. On one occasion, when Appellant's apartment was full of family members attending a traditional Friday-night dinner, Appellant approached A.B. in a bedroom and told her, "We can do things here, it's okay, no one will find out." When A.B. threatened to scream so everyone could hear, according to A.B., Appellant did

6

not appear to care. That evening, A.B. managed to get outside of the bedroom and within sight of Uncle, so Appellant was thwarted.

But, according to A.B., the abuse continued. Whenever Appellant would drive her places, A.B. testified, "he would shove his finger up [her] anus" through her clothes. And A.B. recounted an instance when she was 12 or 13 years old and Appellant "just started grabbing [her] butt" when they were in Walmart shopping for school supplies.

### D. A.B. outcried to Mother and Stepsister, and they confronted Appellant.

According to A.B., the abuse finally stopped when she was about 14. In the next year, when she was 15 and a high school sophomore, A.B. finally succeeded in telling her Mother about the abuse. Mother found A.B. sitting in her closet, upset and crying, and assumed that A.B. was upset that she had lost a tennis match. But instead, A.B. confessed that she was crying because her first boyfriend had recently broken up with her. Mother expressed that she was shocked and upset by this revelation because she had forbidden A.B. from dating until she was older. At that point, A.B. said she "snapped" and confronted Mother, accusing her of ignoring Appellant's sexually abusive behavior over the years.

Mother testified at trial that A.B. told her that Appellant "touch[ed her] everywhere" when he was living with them and pointed to her breasts, between her legs, and her behind. She also said that A.B. told her about his inappropriate

7

touching during the orange-ball game and his touching her bottom while they were shopping at Walmart.

Despite A.B.'s revelation, Mother did not immediately contact the police. Instead, she told Stepsister, who then telephoned A.B. Stepsister testified at trial that A.B. called her and told her about Appellant's abuse. A.B. testified that she told Stepsister, in detail, what had happened and that Stepsister was the first person she told about the "penetration incident." The family still did not contact police, and they waited another week to confront Appellant so as not to disturb Stepbrother's wedding festivities.

A.B., Mother, and Stepsister testified that, after the wedding, Stepsister called Appellant and left a voicemail in which she said she knew what he had done to A.B. The women testified that, within minutes, Appellant returned her call and immediately started apologizing. Stepsister recalled Appellant's pleas for forgiveness and testified that he said, "I'm really sorry what I did. I know I did wrong and I'm asking forgiveness from God that he will forgive me. I know I did what I did, it was wrong and I shouldn't have done it."[5]

Appellant also acknowledged his culpability on a second occasion. Stepfather testified at trial that once, when he and Appellant were finishing their

---

[5]Shortly after the phone call, Appellant's mother came to A.B.'s family's apartment and confronted Mother. A.B. recalled "a lot of screaming" and that Appellant's mother tried to blame A.B., claiming that A.B. had "seduced" Appellant.

8

prayers at the mosque, he asked Appellant what had happened. Stepfather recounted the conversation and Appellant's pleas for forgiveness:

> [Appellant] said, I did five time, but he didn't mention what he do. That was his answer. And he said I prayed to Allah God forgive me what I did wrong or you can beat me. I said, no, I can't do this because . . . I can't take law in my hand to beat you up. And then he said, I consider her as a . . . sister.

Still, the family did not report Appellant to the police. Distressed over her family's lack of action and feeling as though she was being blamed for the abuse, A.B. began struggling at school and on her tennis team. In April 2014, she eventually confided in her tennis coach that she had been abused, and he directed her to the school counselor, Peggy McIntire. When McIntire met with Mother and A.B., she encouraged Mother to arrange counseling for A.B., which Mother agreed to do. But when school began again in the fall, McIntire met with A.B. and discovered that Mother never arranged for counseling. It was at that point that McIntire questioned A.B. about specifics related to the abuse and subsequently reported the abuse to the police.

Accompanied by Mother, A.B. met with Bedford Police Detective Pat Ripley on December 23, 2014. Detective Ripley described A.B. as appearing calm and very intelligent throughout their hour-long interview, and he perceived no indications that she had fabricated any of the allegations. As a result of Detective Ripley's investigation, Appellant was arrested, and in December 2015, he was charged with: (1) one count of continuous sexual abuse of a child by committing aggravated sexual assault by penetrating A.B.'s sexual organ with his

9

finger and/or his penis and indecency with a child by contacting her sexual organ with his hand; (2) one count of engaging in sexual contact by touching A.B.'s genitals; and (3) one count of engaging in sexual contact by touching A.B.'s breast. *See* Tex. Penal Code Ann. § 21.02, § 21.11 (West Supp. 2017).

## II. The trial

### A. Defense counsel's mistake during voir dire

The case proceeded to trial in late September 2016. During voir dire, Juror Number 8 confessed that she would be "somewhat biased because [she] was sexually molested when [she] was a child" and that her "emotions might be more than . . . what [she] would be able to help." When the trial court explained that the case could be emotional "for a lot of people" and asked whether she could follow the law despite any emotional reaction she may have, Juror Number 8 responded that she would "try to follow the law." Later, upon further questioning by defense counsel, Juror Number 8 elaborated on her experiences, explaining that she was molested by several family members and her mother, siblings, and some of her nieces and nephews had also been sexually abused. She told the trial court that the experiences made her very emotional, but that she "could listen and try [her] best to help." Upon further questioning, Juror Number 8 stated, "I think I would like to be on [the jury] and just so that I messed up, can learn to grow beyond what happened." Defense counsel challenged Juror Number 8 for cause but the trial court denied his challenge.

From the record, it is apparent that defense counsel intended to include Juror Number 8 in his list of preemptory strikes, but he failed to do so. Once the court named and seated the members of the jury, counsel requested to approach the bench. In a bench conference, defense counsel asserted that he had struck Juror Number 8, to which the trial court replied that she was not on the defense counsel's list of strikes. Defense counsel admitted his mistake, stating on the record, "That's crazy. I struck the wrong one." The trial proceeded with Juror Number 8 sitting on the jury.

## B. The evidence presented by Appellant

In response to the above-described evidence of abuse that was presented by the State, Appellant testified on his own behalf and presented testimony by his brother, his sister, and his mother.

Through an interpreter, Appellant admitted that he and A.B. played the orange-ball game, but he denied doing so more than three to five times and claimed that any inappropriate touching occurred accidentally. He flatly denied A.B.'s other allegations of abuse. He also denied speaking about the allegations with Stepfather at the mosque or telling Stepfather that "[i]t happened five times." According to Appellant, the first time he heard about the abuse accusations was when Stepsister called and left him a message that said, "Call me." He claimed that, when he called Stepsister back, she and Mother were crying and yelling at him, and, thinking that they were upset with him for playing the orange-ball game with A.B., he apologized once in respect of Stepsister and Mother. As to any

11

requests for forgiveness from God, he explained that in his religion it is customary to ask for general forgiveness every time one prays, not necessarily for anything in particular.

Appellant's mother, brother, and sister testified that they never observed A.B. and Appellant interacting in a manner that concerned them, but they also admitted that they did not join Appellant and Uncle until more than a year after Appellant and Uncle moved to the United States.

## C. Conviction and sentencing hearing

The jury found Appellant guilty of continuous sexual abuse. Appellant elected for the trial court to determine punishment, and the trial court sentenced Appellant to 35 years' confinement.

After Appellant's sentence was pronounced, defense counsel explained on the record that he had discussed Appellant's options for appeal with Appellant and his family. Defense counsel represented that they had discussed "all the pros and cons" of his handling the appeal and Appellant trusted him and requested that he continue his representation and handle the appeal. Defense counsel, who had previously apprised the trial court that he was a candidate for an elected judicial office, claimed that, if elected, he could still file Appellant's brief before assuming the bench, and he requested that the trial court allow him to stay on the case. The trial court consented.

### D. Postsentencing developments

On October 4, 2016, five days after the trial court sentenced Appellant, the State provided defense counsel with a document entitled "State's Response to Defendant's Motion for Discovery of Exculpatory and Mitigating Evidence." The document described itself as a notice served in accordance with *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963) and stated,

> That on or about September 30, 2016 at the Tarrant County District Attorney's Office, [Stepfather] told Assistant Criminal District [Attorneys] Matt Smid and Brook Panuthos that the Defendant is "probably 75 percent innocent." He said that he is basing this opinion on what he did not see. He also said that his brother, [Uncle], never saw anything suspicious happen between [A.B.] and Defendant either. [Stepfather] then asked what he could do to 'undo' the sentence. He also asked if he could bond the Defendant out.

In November, after Appellant's trial counsel was elected to the judicial position he sought, the trial court appointed new appellate counsel.

## Discussion

### I. Ineffective assistance of counsel

Appellant's first two points relate to his claims of ineffective assistance of trial counsel. In his first point, Appellant argues that the Texas rules of appellate procedure and Texas caselaw act to deprive him of his federal constitutional rights to counsel, a fair trial, and to due process of law because there was no way for him to meet the 30-day deadline to file a motion for new trial in order to develop any evidence in support of his claims of ineffective assistance of counsel. In his view, because it is a "practical impossibility" to meet that 30-day

13

deadline, he is forced to bring his claim as a writ for habeas corpus, in which proceeding he would not have the right to assistance of counsel.

In his second point, Appellant requests that we abate the appeal so that he may file an out-of-time motion for new trial with the trial court. Also as part of his second point, he argues that any failure on our part to allow an out-of-time motion for new trial will violate his rights to counsel, fair trial, and due process of law.

Because the resolution of his first point is dependent upon resolution of his second, we will address them in reverse order.

## A. Relevant facts

At the September 29, 2016 sentencing hearing, defense counsel confirmed that he had discussed Appellant's options with Appellant and his family and that Appellant wished to continue with the same counsel. The trial court reappointed defense counsel to serve on appeal, and defense counsel filed Appellant's notice of appeal that same day. On October 4, the State filed and served defense counsel with the *Brady* notice of Stepfather's statements after the trial. Any motion for new trial was due October 29, but none was ever filed. Tex. R. App. P. 21.4.

Following defense counsel's successful election bid, the trial court appointed new appellate counsel for Appellant. Once Appellant's counsel reviewed the record, he determined that Appellant had two possible claims for ineffective assistance of prior counsel. In April, Appellant filed a motion to abate

14

this proceeding and remand it to the trial court so that he could pursue an out-of-time motion for new trial in order to present the two claims of ineffective assistance.  *See* Tex. R. App. P. 2 (permitting an appellate court to suspend the rules of appellate procedure and order a different procedure); *Cooks v. State*, 240 S.W.3d 906, 911 (Tex. Crim. App. 2007) (discussing the availability of an abatement and remand to allow a criminal defendant to file an out-of-time motion for new trial).  We denied his request in an April 13 order.

## B.  Applicable law

As a matter of federal constitutional law, the "appointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected," and this includes the first appeal as of right.  *Mempha v. Rhay*, 389 U.S. 128, 134, 88 S. Ct. 254, 257 (1967); *Douglas v. California*, 372 U.S. 353, 357, 83 S. Ct. 814, 816 (1963).  Following this precedent, the court of criminal appeals has held that the 30-day period following sentencing—during which an appellant may file a motion for new trial— is considered a "critical stage" of criminal proceedings during which a defendant is entitled to effective assistance of counsel.  *Cooks*, 240 S.W.3d at 911; *see* Tex. R. App. P. 21.4 (requiring motions for new trial to be filed no more than 30 days after sentencing).  A defendant may file a motion for new trial in order to adduce facts not otherwise in the record in order to preserve an issue for appeal, such as a complaint of ineffective assistance of counsel.  Tex. R. App. P. 21.2; *Cooks*, 240 S.W.3d at 910 n.5 (citing, among others, *King v. State*, 613 So.2d

15

888, 891 (Ala. Crim. App. 1993) ("post-trial motion is necessary in certain instances to preserve issues for appellate review, most notably claims of ineffective assistance of counsel")).

Where, as here, the appellant was represented by appointed counsel during the 30-day period following sentencing, a rebuttable presumption arises that his appointed counsel continued to adequately represent him during this postconviction stage. *Cooks*, 240 S.W.3d at 911. As part of that presumption, we infer that the attorney discussed the merits of a motion for new trial with the defendant and, with his attorney's counsel in mind, that the defendant declined to pursue the motion. *Oldham v. State*, 977 S.W.2d 354, 363 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 525 U.S. 1181 (1999).

The appellant can rebut this presumption with evidence that the representation was ineffective. *Cooks*, 240 S.W.3d at 911. For instance, in *Cooks*, the defendant was unrepresented by counsel for 20 days after he was sentenced. *Id.* By the time appellate counsel was appointed, there were only 10 days left to file a motion for new trial and the newly-appointed appellate attorney later asserted that this was not enough time for her to adequately assist the defendant in deciding whether to file a motion for new trial. *Id.* The court of criminal appeals held that this was sufficient to rebut the presumption that the appellant was adequately represented during the critical 30-day period after conviction. *Id.*

16

If the presumption of effective representation is successfully rebutted, we move to a harm analysis in which we determine whether the appellant had any "facially plausible claims" that would have been appropriately presented in a motion for new trial. *Id.* at 911–12 (holding that appellate counsel's conclusory allegation that trial counsel failed to call a witness and conduct an investigation did not establish a facially plausible claim of ineffective assistance). *But see Prudhomme v. State*, 28 S.W.3d 114, 121 (Tex. App.—Texarkana 2000, no pet.) (remanding for out-of-time motion for new trial to address claim that defendant's guilty plea was involuntary because of trial counsel's erroneous advice); *Massingill v. State*, 8 S.W.3d 733, 738 (Tex. App.—Austin 1999, no pet.) (same).

## C. Appellant's request for an abatement

Appellant has reiterated in his brief his request for an abatement in order to file an out-of-time motion for new trial, but he has failed to rebut the presumption that he was provided effective assistance during the 30 days following his sentencing. He has provided no evidence to rebut the inference that he and defense counsel discussed the possibility of filing a motion for new trial and Appellant rejected the idea. *See Oldham*, 977 S.W.2d at 363 ("When a motion for new trial is not filed in a case, the rebuttable presumption is that it was considered by the appellant and rejected."). In a reply brief, Appellant's counsel takes issue with this reasoning and points out that Appellant was in prison by the time the clerk's and reporter's records were made available, but we fail to see how that fact should make any difference in our analysis.

17

Without evidence indicating that Appellant did not consider and reject the possibility of filing a motion for new trial, it is not our place to second-guess his decision or that of his trial counsel. *See State v. Morales*, 253 S.W.3d 686, 696–97 (Tex. Crim. App. 2008) ("[R]eviewing courts must not second-guess legitimate strategic or tactical decisions made by trial counsel in the midst of trial, but instead 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]'" (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 2065 (1984))). Because Appellant has not rebutted the presumption that he was provided effective assistance after sentencing, we overrule Appellant's second point without evaluating the facial plausibility of his claims for ineffective assistance.

### D. Appellant's constitutional arguments

Due process guarantees a criminal defendant a fair trial, defined in part by the right to effective assistance of counsel. *Strickland*, 466 U.S. at 684–85, 104 S. Ct. at 2063. Appellant posits that the deadline for filing a motion for new trial acts to deny similarly-situated indigent defendants of their rights to counsel in the critical 30-day period following sentencing because (1) if appointed trial counsel remains on the case, he is unlikely to identify his own ineffective assistance and (2) if new counsel is appointed for the appeal, that new counsel will not be able to identify instances of ineffective assistance until he has received the record, which is generally not prepared until after the 30-day deadline to file a motion for new trial has passed.

18

Appellant acknowledges but dismisses two of the options available to defendants in such a situation. First, an appellant may seek an abatement of his appeal in order to file an out-of-time motion for new trial. Tex. R. App. P. 2; *Cooks*, 240 S.W.3d at 911. Appellant complains that we are "loathe" to do so and that our denial of his request in this case violated his rights to due process, counsel, and a fair trial. *See* U.S. Const. Amends. V, VI, XIV. But as we have discussed above, Appellant failed to meet his burden to rebut the presumption that he was rendered ineffective assistance of counsel during the 30 days following sentencing and the inference that he and defense counsel considered the appellate options, including the filing of a motion for new trial, and decided not to. *See Cooks*, 240 S.W.3d at 911; *Oldham*, 977 S.W.2d at 363. We therefore disagree with Appellant's unsupported assertion that our denial of his request violated his constitutional rights.

Appellant is now left with the option to pursue and develop his claims for ineffective assistance of counsel through a habeas corpus proceeding, but he argues that it is an inadequate remedy because he will not be entitled to the assistance of counsel in filing such an application. *See* Tex. Code Crim. Proc. Ann. art. 11.07 (West 2015) (providing procedure for an application for writ of habeas corpus after a felony conviction without a death sentence); *Ex parte Graves*, 70 S.W.3d 103, 110 (Tex. Crim. App. 2002) (recognizing the well-established principle of federal and state law that there is no right to counsel on a writ of habeas corpus). But even though Appellant is not guaranteed assistance

19

of counsel in filing an application, the trial court is required to appoint counsel on habeas if the trial judge determines that the interests of justice require it. Tex. Code Crim. Proc. Ann. arts. 1.051(c), 26.04(c) (West Supp. 2017); *Ex parte Garcia*, 486 S.W.3d 565, 565–66 (Tex. Crim. App. 2016) (mem. op.) (Keller, P.J., concurring). Additionally, understanding the inherent difficulty of properly presenting legal claims, courts are to liberally construe pro se pleadings, including habeas applications. *See Garcia*, 486 S.W.3d at 566 ("We do not reject a claim just because it is inartfully worded or imperfectly pled.") (Keller, P.J., concurring); *see also Corona v. Pilgrim's Pride Corp.*, 245 S.W.3d 75, 78 n.3 (Tex. App.—Texarkana 2008, pet. denied) ("We review and evaluate pro se pleadings with liberality and patience[.]").

For these reasons, we disagree with Appellant's assertion that the 30-day deadline to file a motion for new trial acted to deny him of his constitutional rights. We therefore overrule his first point.

## II. Outcry testimony

In his third point, Appellant argues that the trial court abused its discretion by admitting Stepsister's outcry testimony because (1) it exceeded the scope of the State's notice of outcry testimony and (2) it duplicated Mother's outcry testimony.

In the prosecution of certain sex crimes, article 38.072 permits the admission of statements that describe the alleged offense that (1) were made by the child against whom the offense was allegedly committed and (2) were made

to the first adult, other than the defendant, to whom the child made a statement about the offense. Tex. Code Crim. Proc. Ann. art. 38.072 § 2(a)(1)(A), (2), (3) (West Supp. 2017). Such statements are not considered inadmissible hearsay if (1) at least two weeks before trial, the party intending to offer the statement notifies the adverse party of its intention to do so and provides the adverse party with the witness's name and a written summary of the statement; (2) the trial court holds a hearing outside the presence of the jury and finds that the statement is reliable based on the time, content, and circumstances of the statement; and (3) the child is available to testify. *Id.* art. 38.072 § 2(b).

Trial courts are afforded broad discretion in determining the admissibility of outcry testimony. *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). We will not disturb the trial court's evidentiary rulings unless a clear abuse of discretion is demonstrated in the record. *Id.* at 92.

### A. Relevant facts

In a September 2016 filing, the State notified Appellant of its intent to present Stepsister's testimony to A.B.'s outcry. The State attached a handwritten statement by Stepsister that read as follows:

> I talk to [A.B.] in feb that when she told me that [Appellant] has been sexually abusing her. She told me that he touched her everywhere on her body on chest, on her back, legs her vegina [sic] and also he did try once to have intercourse but is was hurting her so it didn't happen. I asked her couple times that are you telling me the truth that you guy never had intercourse and she said it never happened he tried but never happened. She was really upset coz she told me that he has been doing this for couple years. I think for good three years. also he did use to have her sit on his laps and use to show

21

her porn on computer while doing this he used to touch her every where. I asked her why she never told any of us so she told me beacuse [sic] she was scared that everyone will blame her coz that what he told her.

During trial but outside the presence of the jury, the trial court conducted a hearing to determine if Stepsister's outcry testimony was admissible under article 38.072. *See* Tex. Code Crim. Proc. Ann. art. 38.072. During the hearing, Stepsister testified that A.B. called her a couple days before Stepbrother's wedding and told her about the abuse. Stepsister testified that A.B. told her that the abuse started with "some ball game" when A.B. was 10 and then Appellant showed A.B. pornography and started touching her everywhere—her breast, her private area, "pretty much all over the body"—and that Appellant tried to have sex with A.B. one time but backed off when it started to hurt A.B. Stepsister also reported that A.B. told her Appellant would bend her over and rub his private part against her.

Appellant's counsel argued that Stepsister's testimony was inadmissible hearsay because it was not specific enough—in his view, it did not clearly establish when the abuse occurred or what kind of touching took place—and because Mother had already testified to A.B.'s outcry regarding Appellant's inappropriate touching. Additionally, he argued that Stepsister's outcry testimony exceeded the State's notice because she testified that the abuse started when A.B. was 10, whereas the notice only stated that A.B. told her the abuse had

22

been going on for "a couple of years" or "a good three years." The trial court overruled Appellant's objections and allowed Stepsister to testify to A.B.'s outcry.

### B. The State's notice of Stepsister's testimony

Here, Appellant argues that Stepsister's outcry testimony exceeded the scope of the State's notice because Stepsister testified that (1) the sexual abuse started during a ball game, (2) he touched A.B. under her clothes, (3) he would bend A.B. over and rub his private part against her, and (4) the abuse started when A.B. was 10 years old. But Appellant has failed to preserve the first three arguments for our review by failing to present them to the trial court. *See* Tex. R. App. P. 33.1 (requiring a party to present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling in order to preserve a complaint for our review). We therefore overrule those portions of Appellant's third point and limit our review to whether Stepsister's statement that A.B. told her the abuse began when A.B. was 10 exceeded the scope of the notice and was therefore inadmissible.

The purpose of the notice requirement is to avoid surprising the defendant with the introduction of outcry hearsay testimony. *Owens v. State*, 381 S.W.3d 696, 703 (Tex. App.—Texarkana 2012, no pet.) (citing *Gay v. State*, 981 S.W.2d 864, 866 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd)). The written summary must give adequate notice of the content and scope of the outcry testimony; in other words, it must reasonably inform the defendant of the essential facts

23

related in the outcry statement. *Id.* (citing *Davidson v. State*, 80 S.W.3d 132, 136 (Tex. App.—Texarkana 2002, pet. ref'd)).

Even if we were to hold that Stepsister's testimony that A.B. told her the abuse began at 10 years old exceeded the scope of the State's notice, any error in admitting the testimony was harmless. We would only reverse such error if it affected a substantial right of the appellant—in other words, if it had a substantial and injurious effect or influence on the jury's verdict. *See* Tex. R. App. P. 44.2(b); *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946). In determining whether a faulty notice of outcry testimony is harmless error, courts have looked to whether the defendant was actually surprised by the outcry evidence. *See, e.g.*, *Patterson v. State*, Nos. 02-10-00350-CR, 02-10-00351-CR, 2012 WL 171115, at *8 (Tex. App.—Fort Worth Jan. 19, 2012, no pet.) (mem. op., not designated for publication); *Gabriel v. State*, 973 S.W.2d 715, 720 (Tex. App.—Waco 1998, no pet.).

On appeal, Appellant does not explain how he was surprised by Stepsister's testimony that A.B. claimed the abuse began when she was 10, but at trial, Appellant's counsel argued that the State's notice left open a 15-year window in which the abuse could have occurred—from A.B.'s birth to the time she outcried. But this argument ignores the undisputed evidence that Appellant did not move to the United States and into A.B.'s apartment until A.B. was 10. Additionally, A.B. herself testified that the abuse began when she was 10 years old. *See Moody v. State*, No. 11-15-00087-CR, 2017 WL 3574271, at *3 (Tex.

24

App.—Eastland Aug. 17, 2017, pet. ref'd) (mem. op.) (holding that, even if outcry testimony was erroneously admitted, such error was harmless where the complainant testified without objection to the same facts); *Allen v. State*, 436 S.W.3d 815, 822 (Tex. App.—Texarkana 2014, pet. ref'd) (holding erroneous admission of outcry testimony was harmless where the complainant testified to the same facts, was available for cross-examination, and her testimony alone was enough to support the conviction). We fail to see how Stepsister's testimony could have surprised Appellant and therefore overrule Appellant's third point as it relates to the State's notice of Stepsister's outcry testimony.

### C. Duplication of Mother's testimony

In the second portion of his third point, Appellant argues that the trial court erred by allowing Stepsister to testify to A.B.'s statement that Appellant touched her on her breasts, between her legs, and on her behind because the trial court had already allowed Mother to testify to the same statement by A.B.

Under article 38.072, a proper outcry witness is the first adult to whom the child spoke about the abuse "in some discernable manner." *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011) (discussing Tex. Code Crim. Proc. Ann. art. 38.072.) The child's statements must be more than "a general allusion that something in the area of child abuse is going on." *Id.* (citing *Garcia*, 792 S.W.2d at 91). Outcry statements are event-specific, not person-specific, so multiple outcry witnesses may testify if each of them testifies to a different event. *Id.*;

*Hines v. State*, No. 02-15-00468-CR, 2017 WL 1738022, at \*7 (Tex. App.—Fort Worth May 4, 2017, no pet.).

The State seems to argue that Mother's outcry testimony was not actually outcry testimony because it did not describe an "actual discernable offense" because more evidence was necessary to show that Appellant touched A.B. with the intent to arouse or gratify his sexual desire.[6] But this argument removes Mother's statement from the context in which it was made—having become upset at A.B. for having a romantic relationship without Mother's permission, A.B. accused her Mother of allowing Appellant to abuse her by touching her private areas. Intent is almost always shown through circumstantial evidence. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) ("Direct evidence of the requisite intent is not required . . . ."); *Edwards v. State*, 497 S.W.3d 147, 157 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). We disagree with the State's argument.

But even assuming, without holding, that the trial court erred by admitting Stepsister's testimony that A.B. told her Appellant touched her breasts, between her legs, and on her behind, any such error was harmless. *See* Tex. R. App. P. 44.2(b); *Kotteakos*, 328 U.S. 750 at 776, 66 S. Ct. at 1253. A.B. testified to the timeline of Appellant's continuous sexual abuse of her that began when he moved into her apartment when she was 10 years old. She testified in detail to multiple instances of inappropriate touching over the years, his showing her

---

[6]We note that if the testimony was not admissible as outcry testimony, it was likely inadmissible hearsay.

pornography online, his actions in "dry-humping" her and rubbing his penis against her body, and his attempt to have sex with her. The jury also heard Mother, Stepfather, and Stepsister testify to Appellant's acknowledgments of the abuse and his requests for forgiveness from God. We do not view any error in admitting Stepsister's outcry testimony as substantially swaying the jury in assessing guilt. *See Elder v. State*, 132 S.W.3d 20, 28 (Tex. App.—Fort Worth 2004) (holding that erroneous admission of outcry testimony was harmless where it was the same or similar to testimony admitted through several other witnesses), *cert. denied*, 544 U.S. 925 (2005); *Allen*, 436 S.W.3d at 822. We therefore overrule the remainder of Appellant's third point.

## Conclusion

Having overruled Appellant's three points, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL: SUDDERTH, C.J.; GABRIEL and KERR, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 15, 2018

27