Opinion issued June 19, 2025



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00399-CV

———————————

**DANNY KANADY, Appellant**

**V.**

**WING KA JOEY CHAN, Appellee**

---

**On Appeal from the 280th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-26779**

---

## MEMORANDUM OPINION

Danny Kanady appeals the trial court's imposition of a protective order in favor of his former girlfriend. In three issues, Kanady argues the trial court erred by (1) issuing a protective order requiring him to vacate the house where he was

living, (2) ruling he committed family violence, and (3) issuing a five-year protective order.

We affirm the trial court's protective order.

**Background**

Appellee Wing Ka Joey Chan, a psychiatric mental health nurse practitioner, and Kanady met at a bar in early December 2022, and immediately started dating. They had an intimate, serious relationship and lived together, but they were not married. Chan was renting a house when she first met Kanady ("First House), but after meeting Kanady, she spent the night at his house every day until late January 2023, when she rented a second house ("Second House") for her and Kanady to live in together. Chan was the only person listed on the lease for the First and Second House. When they moved in together, Kanady and Chan decided his friends would move into the First House and pay Chan rent.

After living together for about four months, Chan filed an application for a protective order on April 28, 2023. She asserted that Kanady had engaged in conduct constituting "family violence" and committed acts "intended by [Kanady] to result in physical harm, bodily injury, assault, or sexual assault, or were threats that reasonably placed [Chan] in fear of imminent physical harm, bodily injury, assault, or sexual assault." Chan pleaded that Kanady's conduct was "reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass" her. She requested

2

that he be prohibited from, among other things, committing family violence as defined by Section 71.004 of the Texas Family Code,[1] threatening or harassing her, going within 500 feet of her, going to her residence or place of employment, communicating with her except through an attorney or person appointed by the court, and interfering with her use of the Second House. The protective order also awarded Chan exclusive use and possession of the Second House and ordered Kanady to vacate that house.

Chan submitted an affidavit in support of her application for protective order stating she "had to run away from [her] own home due to safety concerns when [Kanady] made verbal threats of bodily harm." She stated that on April 7, 2023, Kanady told her, "I will fuck you up. I will fuck up your whole entire world Bitch. I will stomp you on the fucking ground just like your Ex used to do." Chan stated that she "begged [Kanady] to stop" and that he "spat repeatedly directly in [her] face, while yelling and screaming at [her] with three of his children . . . asleep in other areas of the house." According to Chan, Kanady and his mother "continued

---

[1]     The Family Code defines "family violence" as

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

TEX. FAM. CODE § 71.004(1).

3

to sabotage" every aspect of her life since then, "affecting [her] safety and well-being, as well as the safety and well-being of both [her] sister and teenage niece." She claimed they harassed her repeatedly with scare tactics demanding, among other things, that she put the lease on the Second House under Kanady's name and that she give Kanady her 2015 Dodge, which Chan claimed she had "purchased prior to meeting [Kanady]." Chan also claimed that Kanady "devised a plan to cause trouble at [her prior] place of employment" by making false allegations of "HIPPA violations" against her and telling her supervisor that her clinic would be "in jeopardy" if she did not fire Chan.[2] Chan stated she was in fear of her safety because Kanady was a "felon who owns multiple firearms."

The trial court issued a temporary ex parte protective order on May 1, 2023. The court then held a hearing on the application for protective order on May 17, 2023.

**Hearing on Application for Protective Order**

**A.    Wing Ka Joey Chan**

Chan testified that Kanady's friends had not paid her rent on the First House, and they refused to move out. Kanady continued to live in the Second House even

---

[2]    HIPAA refers to the Health Insurance Portability and Accountability Act of 1996, which established standards to protect health information from disclosure without the patient's permission. *See* Pub. L. 104–191, 110 Stat. 1936.

though Chan had asked him to move out. Chan was not living in either of the leased houses.

Chan testified she left the Second House on April 8, 2023, because she and Kanady got into "the worst fight" they had ever had, he threatened her with "bodily harm," and used "very vulgar language" to threaten her. Kanady "threatened to 'F' [her] up, 'F' up [her] whole world." He threatened to stomp on her, spit in her face, and threatened her such that she was "in fear for [her] safety." According to Chan, Kanady said to her, "I will fuck you up, Bitch. I will fuck up your whole world. I will stomp on you on the fucking ground like your ex used to." She testified that she did not know at the time that Kanady had spent time in jail for assault of a family member.

Chan's possessions were still in the Second House but she had not been able to retrieve them. She testified that ever since leaving the Second House, Kanady had threatened her: "He's threatened my professional license. He's threatened to put me in jail. He's threatened child neglect charges . . . for his children." Chan explained that Kanady threatened her nursing license by falsely reporting to her supervisor that Chan had violated HIPAA, and he threatened to take certain "documents, audio, video recordings' to the Texas Medical Board and the Texas Board of Nursing." Chan was forced to resign from her job in April 2023, because Kanady contacted her employer "with allegations that [she] violated HIPAA while

5

working remotely from home" and threatened to "shut down" her employer's clinic by reporting the clinic and Chan to the Texas Medical Board and the Texas Board of Nursing unless Chan was fired.

According to Chan, Kanady told her he would drop the HIPAA allegations if Chan agreed to put his mother on the lease for the First House, where his mother had been staying. Kanady demanded that Chan turn the utilities on at the First House and let him stay at the Second House. Kanady also demanded that Chan give him her Dodge Challenger, which Chan claimed she paid off on her own before meeting Kanady.

Chan read several text messages from Kanady. The first one stated:

Look ion wanna hurt u are do nth to u! that ain't my M O but ion like how u going about this ion like what ima have to do! ion like how u tried to set me up either! you wasn't 100 with me on the whole issue! i would love to actually talk to u so we can go over the details! u may can't save that job but ion want you to lose your career over bs! talking would be the best option i think ain't nobody trying to fuss with you what's done is done

The second text message concerned Kanady's intent to interfere with Chan's job:

i have set the appointment with dr brown at 6 pm to give her the evidence and everything i got video voice recordings and documents! i really don't want to do this to you! i don't want to talk about our relationship! but i do wanna to be heard on something! all i ask for is simple shit! and we can be done! u go your way i goes mines. an I can ghost dr brown and not turn this shit in! that way you can live your life with growth and peace! get at me before i get with her! thanks not trying to hurt you

6

Chan's counsel also played an audio recording in which Kanady threatened to "press charges" against Chan and threatened to take additional allegedly incriminating documents to her supervisor, Dr. Brown. During the twenty-minute recording,[3] Kanady repeatedly said he lived in the Second House, that he had "established residency" there, and that he did not have to leave because his eleven-year-old son's name appeared on the lease.[4]

Chan believed Kanady was trying to blackmail her so he could stay in the Second House. She testified she was afraid Kanady would physically hurt her and harass her at a new job. Chan stated she wanted Kanady to stay away from her and any potential employers and stop trying to blackmail her. She felt Kanady's actions were harassing and constituted stalking. She testified she was afraid to return to the Second House, where Kanady was living.

**B.    Danny Kanady[5]**

Kanady testified he lives in the Second House and that Chan asked him to leave the house. His family and friends live in the First House. According to Kanady, Chan told him the Dodge Challenger was his, but there is no paperwork of

---

[3]    It is unclear whether Chan's counsel played the entire twenty-minute audio for the trial court.

[4]    Two of Kanady's minor children were identified on the lease as occupants permitted "to reside on the Property during the term of the lease[.]"

[5]    Kanady was first called by Chan's counsel and subsequently testified on his own behalf.

her gifting the car to him. The title and the auto insurance policy are in Chan's name. Kanady did not have the keys to the car.

According to Kanady, both he and Chan said "crazy stuff" to each other, but he denied telling Chan she needed to let him stay in the Second House or that he would go to the Nursing Board with evidence against her. He denied threatening Chan's supervisor or her license or spitting in Chan's face.

Kanady testified that 20 years ago or more, he spent 150 days in the Harris County Jail after being convicted of theft between $15,000 and $20,000, and he also was convicted of forgery and attempted burglary. At the time of the protective order hearing, Kanady had a DWI pending, for which he was on bond.

According to Kanady, Chan abused cocaine and marijuana, had "horrible mood swings" as a result, and he recorded her to "show her her mood changes, her mood swings." He testified that Chan abused drugs between sessions at work, and did not allow Kanady to leave the house. "And so I just stayed at home every day to make sure that she was okay. I cooked for her, I cleaned for her." He said that he came home one day in April and Chan was gone.

On April 17, 2023, after Chan had the lights shut off at the Second House, Kanady texted her that the gloves were coming off "because [he] hasn't been bothering her." He texted Chan that he had an appointment with her employer "to give her the evidence and everything I got on you." According to Kanady, he did

8

not want to hurt Chan, who is "not a bad person." He stated he was "really sorry" he "did it to her, but [he] didn't know what to do. I just wanted her to stop and chill." Kanady explained he said "that stuff on the [audio] tape but that wasn't me. That was only because [Chan] kept bothering . . . she steady picking at me and I'm at home not bothering nobody." Kanady destroyed the videos because he did not want to embarrass Chan. According to Kanady, "It hurt me to go tell her boss that she was doing drugs while at work, but she pushed me there."

Kanady wanted Chan to return money to him for the deposit, the first month's rent and the last month's rent on the Second House. He told Chan he would get the bills for the Second House switched to his name and he would pay everything. He testified, "I don't want to lose my money for the house and it seems like that's the biggest problem is the house." Kanady testified it was not fair to make him move. He claimed they chose the house because it was in his children's school district and that he and Chan had an agreement.

Kanady testified he "never threatened [Chan]. That ain't me no more." He said he was not trying to hurt Chan. He loves her and his kids considered her a mother figure. He testified Chan is a good person but "the drugs changed her." According to Kanady, he was

> scared that [Chan would] use that restraining order to come do something and have me locked up now, because I'm not doing nothing to her. What do you need a restraining order for? . . . I know where she stay at, but I don't go over there. I don't care. I'm not

9

following her around. I don't care. I stay at the [Second] [H]ouse. I have children to take care of. I don't have time to be chasing a woman. . . . I don't text her. I don't call her. I figured when she comes around she'll call me and we can work out whatever we need or she can call my momma. They can work it out.

## C.  Joy Lauderdale

Kanady called Joy Lauderdale, who knows him through her husband, to testify on his behalf. Lauderdale testified that she moved into the First House.[6] She testified she never saw Chan or Kanady exhibit violence toward the other and she does not think Kanady would "do anything" to Chan. To her knowledge, Kanady has not been "bothering" Chan.

## Closing Arguments and Ruling

During his closing argument, Chan's counsel argued there was "no evidence at all" that Chan used illegal drugs. He argued Kanady attacked Chan, "got in her face, threatened her, and then attempted to manipulate her so he could stay in this house, Ms. Chan's house." He argued that when Chan ended the relationship, Kanady "went after Ms. Chan in ways that are almost incomprehensible. Went after her job, went after her professional license, threatened to show unknown videos and tapes and everything else to the licensing board[.]" He also threatened to bring charges against her for some reason. Counsel argued that Chan was afraid

---

[6]     It was unclear when Lauderdale lived in the First House.

of Kanady physically injuring her, harassing her, and stalking her.  She requested a no-contact order for two years and an order to vacate the Second House.

Kanady argued during his closing that he does not contact Chan unless she contacts him first.  He said they agreed to split costs—apparently regarding the Second House—down the middle and that's what they did.  Kanady stated he wanted time to move out of the Second House.

After both sides closed, the court issued an oral ruling stating:

This Court finds that family violence has occurred.  That family violence is likely to occur in the future and that you, Danny Lanard Kanady, ha[ve] committed family violence against Wing Ka Joey Chan.[7]  Family violence of a felony nature, specifically, blackmail and

---

[7] When Chan's protective order was issued, Chapter 85 of the Family Code provided:

(a)    At the close of a hearing on an application for a protective order, the court shall find whether:

(1)    family violence has occurred; and

(2)    family violence is likely to occur in the future.

(b)    If the court finds that family violence has occurred and that family violence is likely to occur in the future, the court:

(1)    shall render a protective order as provided by Section 85.022 applying only to a person found to have committed family violence; and

(2)    may render a protective order as provided by Section 85.021 applying to both parties that is in the best interest of the person protected by the order or member of the family or household of the person protected by the order.

TEX. FAM. CODE § 85.001 (former version).  The legislature amended section 85.001, effective September 1, 2023, removing the requirement that the trial court make a likelihood-of-future-violence finding.  *See* Act of May 24, 2023, 88th Leg., R.S., Ch. 688, §§ 8,9, 2023 Tex. Sess. Law Serv. C. 688, §§ 8, 9 (H.B.

extortion that gives me the authority to issue a protective order in excess of two years. I'm, therefore, going to issue a five-year no contact protective order in favor of Ms. Chan and against you.

The court gave everyone living in both houses two weeks to vacate the properties. The court awarded Chan's counsel $4,100 in attorneys' fees and costs.

The following day the trial court issued a final protective order finding, among other things, that Chan and Kanady were involved in a dating relationship, that family violence had occurred, and that family violence was likely to occur in the future. The court prohibited Kanady from engaging in several enumerated acts and it set the duration of the protective order for a period of five years.

Kanady filed a motion for new trial, which was overruled by operation of law.[8]

This appeal ensued.[9]

## Standard of Review

We review the grant of a protective order for legal and factual sufficiency using the same standard we use in evaluating the sufficiency of the evidence

---

1432); *see also Henry v. Vaella*, No. 01-22-00869-CV, 2024 WL 4885438, at *3 (Tex. App.—Houston [1st Dist.] Nov. 26, 2024, no pet.) (mem. op.).

[8] The appellate record does not include a ruling on the motion for new trial. *See* TEX. R. CIV. P. 329b(c) ("In the event an original or amended motion for new trial . . . is not determined by written order signed within seventy-five days after the judgment was signed, it shall be considered overruled by operation of law on expiration of that period.").

[9] Chan did not file an appellate brief.

12

following a jury verdict.[10]  *Hollimon v. Williams*, No. 01-22-00414-CV, 2023 WL

4710895, at \*4 (Tex. App.—Houston [1st Dist.] July 25, 2023, pet. denied) (mem.

op.); *Yang v. Cao*, 629 S.W.3d 666, 670 (Tex. App.—Houston [1st Dist.] 2021, no

pet.).  When, as here, a party who does not have the burden of proof at trial

challenges the legal sufficiency of the evidence, we consider the evidence in the

light most favorable to the prevailing party, indulging every reasonable inference

in that party's favor and disregarding contrary evidence unless a reasonable

factfinder could not.  *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827

(Tex. 2005)); *City of Hous. v. Hildebrandt*, 265 S.W.3d 22, 27 (Tex. App.—

Houston [1st Dist.] 2008, pet. denied) (citing *Assoc. Indem. Corp. v. CAT

Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998)).

We may not sustain a legal sufficiency, or "no evidence" point, unless the

record demonstrates (1) a complete absence of evidence of a vital fact; (2) the

court is barred by rules of law or of evidence from giving weight to the only

evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact

is no more than a mere scintilla; or (4) the evidence conclusively establishes the

---

[10]  There is a split among Texas' intermediate courts of appeals on the standard of review applicable to the appeal of a protective order. *Hollimon v. Williams*, No. 01-22-00414-CV, 2023 WL 4710895, at \*5 n.3 (Tex. App.—Houston [1st Dist.] July 25, 2023, pet. denied) (mem. op.).  Some courts apply an evidentiary-sufficiency standard while others apply an abuse-of-discretion standard. We apply the former. *Id.*

opposite of the vital fact. *Gabel v. Gabel-Koehne*, 649 S.W.3d 590, 599 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (citing *City of Keller*, 168 S.W.3d at 810). If more than a scintilla of evidence exists to prove a vital fact, the evidence is legally sufficient and we will overrule the issue. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005); *Hildebrandt*, 265 S.W.3d at 27. There is more than a scintilla of evidence if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

When a party attacks the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Hollimon*, 2023 WL 4710895, at *4. In conducting a factual-sufficiency review, we examine, consider, and weigh all evidence that supports or contradicts the fact finder's determination. *Id.*

"It is the fact finder's role to resolve conflicts in the evidence, and we may not substitute our judgment for that of the fact finder." *Id.* at *5; *McKeehan v. Wilmington Sav. Fund Soc'y, FSB*, 554 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2018, no pet.). After considering and weighing all the evidence, we will set aside the order only if the evidence is so weak, or the finding is so against the great

14

weight and preponderance of the evidence, that it is "clearly wrong and unjust." *Boyd v. Palmore*, 425 S.W.3d 425, 429 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

## Kickout Order

In his first issue, Kanady argues the trial court erred "in ruling that [he] committed family violence, and thereby constructively and actively evict[ing] him." This argument does not actually turn on the commission of family violence, but on the trial court's protective order requiring Kanady and his relatives to vacate both houses within two weeks. Kanady argues:

> [T]o have a protective order issued in lieu of a kickout order when no domestic violence or some type of violence had occurred within the past 30 days, clearly evidences a bias or an intent to deny and/or deprive [Kanady of] a fair adjudication based on the evidentiary findings.

> Chan testified that although she was the only name on the lease, [she] however moved Kanady and his children in at the [Second House]. Chan testified that Kanady paid bills at that address and no requested relief should have been granted. Especially when Chan herself conceded that within the past 30 days, no violence at the community home had occurred.

This quoted language is the entirety of Kanady's argument on this point. Kanady does not cite to the record and or to any authority for support. He thus waived his issue. *See Velasquez v. Waste Connections, Inc.*, 169 S.W.3d 432, 436 (Tex. App.—El Paso 2005, no pet.) ("Because Velasquez's argument does not contain a single reference to a relevant case or legal principle, the issues are not

15

adequately briefed and are considered waived.") (citing TEX. R. APP. P. 38.1(i)); *C.L.W. v. R.V.W.*, No. 01-21-00283-CV, 2023 WL 5109878, at \*12 (Tex. App.—Houston [1st Dist.] Aug. 10, 2023, no pet.) (mem. op.) (noting Rule 38.1(i) is not satisfied by "brief conclusory statements, unsupported by legal citations.") (quoting *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)).

We further note that contrary to Kanady's argument, Chan did not concede that "no violence at the community home had occurred" within the thirty days prior to the protective order hearing. Regardless, it is unclear from Kanady's sparse briefing under what circumstances a "kickout order" should have been issued instead of a protective order, or even what a "kickout order" is. "It is not this court's duty to review the record, research the law, and then fashion a legal argument for appellant when [appellant] fail[s] to do so." *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931–32 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citation omitted).

We overrule Kanady's first issue.

**Family Violence**

In his second issue, Kanady argues the trial court "erroneously found there were reasonable grounds to believe [Chan] was the victim of stalking/blackmail" pursuant to Section 42.072 of the Texas Penal Code.

16

We note at the outset that the trial court specifically found that Kanady committed "family violence" and that "family violence is likely to occur again in the future." The order states that Kanady "committed family violence as described in Section 85.025(a-1)." The court further found Kanady

> committed the general offense of theft, as defined in Sections 31.01 and 31.02 of the Texas Penal Code, in the form of blackmail and extortion, Chapter 21, Texas Penal Code and is considered a felony under Section 31.03(e)(4)(A) and the nature of the scheme or course of conduct engaged in by [Kanady] in committing the offense indicates [Kanady] is likely in the future to engage in conduct prohibited by Chapter 31, Section 31.01-31.03; 31.07.[11]

Here again, we conclude Kanady waived this issue. The only citation to legal authority in his two-page argument is to Section 42.072 of the Penal Code, which is not a Penal Code section underlying the trial court's findings. There are also no citations to the record. *See* TEX. R. APP. P. 38.1(i); *Velasquez*, 169 S.W.3d at 436; *C.L.W.*, 2023 WL 5109878, at \*12. Kanady makes assertions about the

---

[11] There is no extortion offense in today's Texas Penal Code, but "vestiges survive within the bribery offense under section 36.02 and the theft offense created by section 31.03." *See Ex parte Perry,* 471 S.W.3d 63, 114 (Tex. App.—Austin 2015), *aff'd in part, rev'd in part on other grounds*, 483 S.W.3d 884 (Tex. Crim. App. 2016). The theft offense created by Section 31.03 "was expressly intended to subsume 'extortion' and various other theft-related crimes previously known to the law[.]" *Id.* Theft as defined by Section 31.03 of the Penal Code

> constitutes a single offense superseding the separate offenses previously known as theft, theft by false pretext, conversion by a bailee, theft from the person, shoplifting, acquisition of property by threat, swindling, swindling by worthless check, embezzlement, extortion, receiving or concealing embezzled property, and receiving or concealing stolen property.

TEX. PENAL CODE § 31.02.

definition of and penalties for blackmail and extortion without any authority. *See Canton-Carter*, 271 S.W.3d at 931 ("Failure to cite legal authority or to provide substantive analysis of the legal issues presented results in waiver of the complaint.") (citing *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.)).

Even if Kanady had not waived the issue, we are not persuaded by his argument. The sum total of Kanady's argument is that:

> No evidence admitted at trial shows that Kanady actually produced any documents that alleged a single lawful or unlawful act alleged t[o] [have] been committed by Chan. Chan herself testified that she had no idea what the documents were and was never fired from her job but actually quit her job. The trial court relying on the improper authentication and admission of electronic media found [Chan] was a victim of stalking when evidence admitted failed to prove [Kanady] was indeed the conductor of messages and blocked phone calls he received.

This argument is problematic for several reasons.

First, the trial court did not expressly find that Chan was a victim of stalking. Second, it is unclear what Kanady means when he talks about being the "conductor of messages and blocked phone calls."

Third, even though Chan testified she quit her job, she explained she did so "for safety issues, because [Kanady] ha[d] gone up to [her] office[.]" Kanady conceded that he threatened Chan about contacting the Texas Nursing Board and that he "was going to her boss anyway before all of this happened." Kanady

18

acknowledged "record[ing] [Chan] for weeks and weeks." And during his case-in-chief, Kanady testified about a text message he sent Chan stating, "now the gloves come off. . . . [I] have set the appointment with dr brown at 6 pm to give her the evidence and everything [I] got video voice recordings and documents!" He testified that he set the appointment with Dr. Brown because he was "upset" with Chan. He "told [Chan] I set the appointment with Dr. Brown at 6:00 p.m. to give her the evidence and everything I got on you and documents." Kanady then read a text he sent to Chan:

> I really don't want to do this. I don't want to talk to you about our relationship but there are some things—but I do want to be heard on some—on something. All I asked for are simple things and we can be done. You can go your way, I go mines. [sic] And I can ghost Dr. Brown and not turn this stuff in—turn it in.

Kanady testified he did not provide any documents to Dr. Brown because "I guess it was more of a threat because I was mad that [Chan] cut the lights off on me and the kids without telling me, you know." He later said it "hurt [him] to go tell [Chan's] boss that she was doing drugs while at work, but she pushed me there. She did that." Whether or not Kanady ultimately provided documents to Chan's supervisor, this evidence reflects Kanady nonetheless threatened to do so.

Kanady's authentication arguments are also unavailing. To the extent he complains about the lack of authentication of texts, he proffered the texts during his testimony, some of which were the same texts proffered by Chan. And to the

19

extent he complains about text messages proffered by Chan or the audio recording she played for the trial court, Kanady did not preserve those objections because he did not object in the trial court.[12] *See Edwards v. State*, 497 S.W.3d 147, 163 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (holding appellant's failure to raise improper authentication objections to text messages during trial resulted in failure to preserve complaint on appeal); *Vega v. State*, No. 04-23-00086-CR, 2023 WL 8607035, at *2 (Tex. App.—San Antonio Dec. 13, 2023, no pet.) (mem. op., not designated for publication) (holding failure to object to authenticity of video during trial resulted in failure to preserve error on appeal).

We overrule Kanady's second issue.

### Sufficiency and Duration of Protective Order

In his third issue, Kanady argues the trial court abused its discretion by issuing a protective order with a duration of five years. The main argument Kanady makes in support of his duration argument is that:

> This Court should have no faith in the outcome of this proceeding because the proceeding did not satisfy the appearance of justice. The granting of a 5-year protective order for an applicant who made no such request is a due process violation.[13] In addition, testimony by both Chan and Kanady establishes that Mr. Kanady had no communication within the last 30 days before the application was

---

[12]   Indeed, when specifically asked by the trial court judge if he had any objection to admission of the text messages or the audio recording, Kanady responded he did not.

[13]   Chan did not request a protective order for five years in her application.

20

filed and only sent endearing messages-nonthreatening messages to Chan.

Kanady also argues there was insufficient evidence to uphold the trial court's judgment and that there was no substantial evidence presented to support the finding of family violence and that family violence would occur again.

We construe Kanady's third issue as challenging the trial court's finding that he committed a felony offense involving family violence against Chan, which is a prerequisite finding for the issuance of a protective order for a period greater than two years. *See* TEX. FAM. CODE § 85.025(a-1)(1).[14] Protective orders generally are effective for up to two years, but Section 85.025 (a-1) of the Family Code authorizes a court to render a protective order for a period greater than two years under certain circumstances. *Id*. § 85.025(a-1).

In a bench trial, the trial court, as the trier of fact, is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Townsend v. Vasquez*, 569 S.W.3d 796, 808 (Tex. App.—Houston [1st Dist.] 2018, pet. denied)

---

[14]   Kanady also argues the trial court was biased and that he was deprived of his constitutional right to a fair and impartial hearing. Even had Kanady made a clearly articulated and supported argument on appeal regarding the purported bias of the lower court judge, it would not have been preserved for our review. *See Kinney v. Batten*, No. 01-11-00393-CV, 2012 WL 2928501, at *5 (Tex. App.—Houston [1st Dist.] July 19, 2012, pet. denied) (mem. op.) (holding party waived complaints regarding judicial bias by failing to timely file motion to recuse judge in trial court); *Jonson v. Duong*, 642 S.W.3d 189, 195 (Tex. App.—El Paso 2021, no pet.) ("[A] litigant claiming that a judge is biased or prejudiced must timely move to recuse the judge in the trial court in accordance with [Texas] Rule [of Civil Procedure] 18a; otherwise the issue is waived on appeal.").

21

(citing *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 530 (Tex. App.—Houston [1st Dist.] 1994, no writ)). The trial court may choose to believe some witnesses over others. *Townsend*, 569 S.W.3d at 808 (citing *Martinez v. Lopez*, No. 01-09-00951-CV, 2011 WL 2112806, at *4 (Tex. App.—Houston [1st Dist.] May 26, 2011, no pet.) (mem. op.)).

The protective order provides in pertinent part:

The Court finds that [Chan] and [Kanady] were involved in a dating relationship as defined under the Family Code. The Court finds that family violence has occurred and that family violence is likely to occur in the future. *The Court finds that Respondent, Danny Lanard Kanady, has committed family violence as described in Section 85.025(a-1).* The Court further finds that Respondent Danny Lanard Kanady committed the general offense of theft, as defined in Section 31.01 and 31.02 of the Texas Penal Code, in the form of blackmail and extortion, Chapter 31, Texas Penal Code, and is considered a felony under Section 31.03 (e)(4)(A) and the nature of the scheme or course of conduct engaged in by [Kanady] in committing the offense indicates [Kanady] is likely in the future to engage in conduct prohibited by Chapter 31, Section 31.01-31.03; 31.07. The Court finds that the following protective orders are for the safety and welfare and in the best interest of Applicant Wing Ka Joey Chan and are necessary for the prevention of family violence.

. . .

The Court finds that [Kanady] has previously [been] convicted of theft of $1,500-20,000. *The Court finds that [Kanady] has committed acts constituting a felony offense involving family violence, theft, blackmail and extortion against [Chan], and as such a protective order in excess of 2 years is warranted and authorized by law. . . .* The Court finds that [Kanady] has continually threatened [Chan] so that [Kanady] will continue to control the two residences, prohibit [Chan] from the residences, and disregard [Chan's] demand that [Kanady] vacate the residences. The Court finds that [Kanady] has harassed and threatened

22

[Chan] with physical injury, loss of [Chan's] job, loss of [Chan's] profession, loss of [Chan's] professional license, and loss of [Chan's] employer's professional license.

The Court finds that [Kanady's] actions have caused [Chan] to be in fear of bodily injury or death, and, that further offenses against [Chan's] reputation, employment, and professional license will be committed, and further, that [Chan] feels harassed, annoyed, alarmed, abused, tormented, embarrassed and offended.

(Emphasis added.)

Chan testified during the bench trial that:

- Kanady "threatened bodily harm," "used very vulgar language to threaten [her]," "threatened to stomp on [her] on the ground," "spit[] on [her] face," and threatened her by saying, "Say something again. Say something again. I dare you."

- Kanady "berate[d] [her] and yell[ed] at [her] and threaten[ed] [her]."

- Kanady said to her, "I will fuck you up, bitch. I will fuck up your whole world. I will stomp on you on the fucking ground like your ex used to."

- She was afraid he would physically harm and assault her.

- Since she moved out, Kanady has continued to threaten her with the revocation of her nursing license, threatened to put her in jail, and has threatened to have child neglect charges filed against her with respect to his children.

- Kanady "bought false allegations of [her] violating HIPAA to [her] prior boss."

- Kanady threatened to take allegations of her purported HIPAA violations to the Texas Medical Board and the Texas Board of Nursing.

- Kanady said he would not pursue the HIPAA allegations if she put his mother on the lease at the Second House, had the utilities turned on, and gave him her car.

- Kanady threatened to have her thrown in jail but she did not know on what grounds.

- Kanady went to Dr. Brown's office and allegedly gave her some documents regarding Chan.

- Kanady threatened to have Dr. Brown's clinic "shut down if she did not fire [Chan] or get rid of [her]."

- She was afraid that if she got a new job, Kanady would follow her to the new job and harass her there.

- She believed Kanady was trying to blackmail her so he could stay in the Second House.

- She was afraid that Kanady would physically hurt her.

Chan also proffered text messages she exchanged with Kanady, in which he said:

> Look ion wanna hurt u are do nth to u! that ain't my M O but ion like how u going about this ion like what ima have to do! ion like how u tried to set me up either! you wasn't 100 with me on the whole issue! i would love to actually talk to u so we can go over the details! u may can't save that job but ion want you to lose your career over bs! talking would be the best option i think ain't nobody trying to fuss with you what's done is done

The second text message involved Kanady's intent to interfere with her job:

> i have set the appointment with dr brown at 6 pm to give her the evidence and everything i got video voice recordings and documents! i really don't want to do this to you. i don't want to talk about our relationship! but i do wanna be heard on something! all i ask for is simple shit! and we can be done! u go your way i goes mines! an i can ghost dr brown and not turn this shit in! that way u can live your

life with growth and peace! get at me before i get with her! thanks not trying to hurt you

And Chan offered an audio recording of a conversation she had with Kanady in which he repeatedly refused her request to vacate the Second House, stated he had "established residency" in the house, threatened to "press charges" against her, and threatened to provide additional information about her to Dr. Brown and the "Nurses' Board." Among other things, Kanady stated during the recorded phone call, "You can keep playing with me and I'll ruin your career."

Viewing the evidence in the light most favorable to the trial court's finding, as we must, and indulging all reasonable inferences that would support that finding, we hold the trial court could have determined that Kanady's actions constituted threats that reasonably placed Chan in fear of imminent physical harm, bodily injury, assault, or sexual assault. *See* TEX. FAM. CODE § 71.004(1). Because the evidence is such that reasonable and fair-minded people could reach different conclusions, we hold that more than a scintilla of evidence exists to support the trial court's finding that Kanady committed family violence against Chan. *See Haggar Clothing Co.*, 164 S.W.3d at 388. We also hold that this finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Hollimon*, 2023 WL 4710895, at *4. We thus overrule Kanady's sufficiency challenge on this issue.

We now turn to Kanady's challenge regarding the duration of the protective

25

order. To issue a protective order that exceeds two years in duration, the trial court must have found that Kanady committed a felony offense involving family violence against Chan. Section 85.025(a-1) enumerates the circumstances in which a protective order can be extended beyond two years. Relevant here, Section 85.025(a-1)(1) provides that a trial court may render a protective order for a period that exceeds two years if the court finds that the person who is the subject of the protective order "committed an act constituting a felony offense involving family violence against the applicant or a member of the applicant's family or household, regardless of whether the person has been charged with or convicted of the offense." TEX. FAM. CODE § 85.025(a-1)(1).

> The protective order states in pertinent part:
>
> The Court finds that Respondent, Danny Lanard Kanady, has committed family violence as described in Section 85.025(a-1). The Court further finds that Respondent Danny Lanard Kanady committed the general offense of theft, as defined in Section 31.01 and 31.02 of the Texas Penal Code, in the form of blackmail and extortion, Chapter 31, Texas Penal Code, and is considered a felony under Section 31.03(e)(4)(A) . . . .

We construe the protective order to memorialize the trial court's finding that Kanady committed a felony offense involving family violence against Chan. We conclude that sufficient evidence supports the trial court's finding. The protective order includes a finding that Kanady's "continual[] threat[s]" have caused Chan "to

26

be in fear of bodily injury or death[.]"[15]  This finding constitutes a misdemeanor assault as defined by Section 22.01 of the Texas Penal Code.  *See* TEX. PENAL CODE § 22.01 (defining misdemeanor assault as "intentionally or knowingly threaten[ing] another with imminent bodily injury").  At the time the trial court issued the protective order, Section 22.01 provided that an assault becomes a felony offense if (1) it is committed against someone in a dating, familial, or household relationship with the alleged assailant, and (2) the alleged assailant previously has been convicted of one of several enumerated offenses, including assault, against someone with whom the assailant was in a dating, familial or household relationship pursuant to Sections 71.0021(b), 71.003, or 71.005 of the Texas Family Code.  *See id.* § 22.01(b)(2).

During the hearing, Kanady conceded he previously was convicted of assault of a family member.  The evidence before the trial court thus established that (1) Kanady committed an assault against Chan, with whom he was in a dating relationship, and (2) he had a conviction for assault on a family member.  We thus

---

[15]  The trial court's findings as to Chan's fear of Kanady are supported by Chan's testimony that she and Kanady got into "the worst fight" they had ever had on April 8, 2023, when he threatened "bodily harm" and used "very vulgar language" to threaten her.  Further, she testified, Kanady "threatened to "F" [her] up, "F" up [her] whole world."  He allegedly threatened to stomp on her, spit in her face, and threatened her such that she was "in fear for [her] safety."  He said to her, "I will fuck you up, bitch.  I will fuck up your whole world.  I will stomp on you on the fucking ground like your ex used to."  In response to her counsel's questions, she testified that she was afraid Kanady would hurt her.

27

conclude that the trial court did not err in extending the duration of the protective order to five years.

We overrule Kanady's third issue.

## Conclusion

We affirm the trial court's protective order.


Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.